Opinión disidente y concurrente emitida por la
Jueza Asociada Señora Fiol Matta.
En este caso está en controversia si los terrenos ganados al mar que son parte del predio donde se construye el proyecto Paseo Caribe son bienes de dominio público. Una mayoría de este Tribunal concluye que no lo son. Disiento, en parte, de esta decisión pues el análisis de las leyes, la jurisprudencia y los principios aplicables a la controversia me llevan a concluir que los terrenos ganados al mar que son parte de la parcela denominada “Coast Guard Parcel” constituyen bienes de dominio público del Pueblo de Puerto Rico desde su traspaso a nuestra jurisdicción en 1991. En cuanto a los terrenos ganados al mar en la parcela conocida como “Condado Bay Parcel”, concurro con la decisión mayoritaria.
I. El Tratado de París de 1898
En 1898, a través del Tratado de París, Estados Unidos adquirió todas las tierras de Puerto Rico que eran propiedad de la Corona Española.([1]) Sobre el particular, el Art. *577 VIII del Tratado dispone lo siguiente:
En cumplimiento de lo convenido en los artículos I, II y III de este tratado, España renuncia en Cuba y cede en Puerto Rico y en las otras islas de la Indias Occidentales, en la Isla de Guam y en el Archipiélago de las Filipinas, todos los edificios, muelles, cuarteles, fortalezas, establecimientos, vías públicas y demás bienes inmuebles que con arreglo a derecho son del dominio publico, y como tal corresponden a la Corona de España. (Énfasis nuestro.) Art. VIII, Tratado de París de 1898, L.P.R.A., Tomo 1, ed. 1999, pág. 19.
En virtud de este artículo, Estados Unidos adquirió los bienes de dominio público que pertenecían a la Corona Española, entre éstos, las playas, sus riberas y la zona marítimo-terrestre. En El Pueblo v. Dimas et al., 18 D.P.R. 1061 (1912), este Tribunal explica que, según el Art. 339 del Código Civil español, vigente cuando se celebró el Tratado de París, las playas y sus riberas eran bienes de dominio público.([2]) De igual forma, según la ley de puertos española vigente en aquella fecha, la zona marítimoterrestre era un bien de dominio público que pertenecía a la Corona Española y, por lo tanto, fue adquirido por Estados Unidos a través del tratado. ([3]) Ley de Puertos española de 1880, Colección Legislativa de España, Madrid, 1881, T. 124, 2da parte, pág. 787. Véanse: El Pueblo v. Dimas et al., *578 supra, págs. 1072-1073; Pueblo v. Del Valle, 60 D.P.R. 184, 190-192 (1942).
II. La Ley Foraker de 1900
El 12 de abril de 1900 el Congreso de Estados Unidos aprobó la Carta Orgánica de 1900, mejor conocida como la Ley Foraker. 31 Stat. 77, Documentos Históricos, L.P.R.A., Tomo 1. Dos secciones de esta ley son particularmente importantes para la solución de este caso.
La primera, la See. 8 de la Ley Foraker, mantuvo en vigor las leyes y ordenanzas de Puerto Rico vigentes al aprobarse la ley federal en todo aquello que fuera incompatible con las leyes de Estados Unidos localmente aplicables o con las disposiciones de la propia Ley Foraker, mientras no fueran alteradas, enmendadas o revocadas por la autoridad legislativa de Puerto Rico o por una ley del Congreso. Carta Orgánica de 1900, Documentos Históricos, supra, Sec. 8, págs. 30-31.([4]) Muñoz Díaz v. Corte, 42 D.P.R. 384, 390 (1931). Aunque habremos de analizar esta sección más adelante, es importante mencionar en este punto que, de acuerdo con ésta, tanto el Código Civil español de 1889, extendido a Puerto Rico por Real Decreto del 31 de julio de 1889, como la Ley de Puertos española de 1880, extendida a Puerto Rico por Real Decreto en 1886 y denominada como la Ley de Puertos para la Isla de Puerto Rico, mantuvieron su vigencia en la isla luego del traspaso de soberanía en 1898. Respecto a la Ley de Puertos para la Isla de Puerto *579 Rico (la Ley de Puertos de 1886), véanse: Colección Legislativa de España, Madrid, 1888, T. 136 (Ira Parte), pág. 434; Rubert Armstrong v. E.L.A., 97 D.P.R. 588 (1969). En cuanto a la vigencia del Código Civil español en Puerto Rico, véanse: Colección Legislativa de España, Madrid, 1890, T. 143, pág. 582; Olivieri v. Biaggi, 17 D.P.R. 704 (1911).
La segunda sección en la que debemos detenernos es la Sec. 13 de la Ley Foraker, mediante la cual el Gobierno de Estados Unidos traspasó al Gobierno de Puerto Rico algunos de los bienes de dominio público que adquirió de la Corona Española bajo el Tratado de París, sin incluir entre ellos la superficie de los puertos ni las aguas navegables. Sobre el particular, la Sec. 13 dispone lo siguiente:
Que todas las propiedades que puedan haber adquirido en Puerto Rico los Estados Unidos por la cesión de España en dicho Tratado de Paz [Tratado de París de 1898], en puentes públicos, casas camineras, fuerza motriz de agua, carreteras, corrientes no navegables, y los lechos de las mismas, aguas subterráneas, minas o minerales bajo la superficie de terrenos particulares, y toda propiedad que al tiempo de la cesión pertenecía, bajo las leyes de España entonces en vigor, a las varias Juntas de Obras de Puertos de Puerto Rico, y todas las orillas de los puertos, muelles, embarcaderos y terrenos saneados, pero sin incluir la superficie de los puertos o aguas navegables, por la presente quedan bajo la dirección del Gobierno establecido por esta Ley, para ser administrados a beneficio de El Pueblo de Puerto Rico; y la Asamblea Legislativa creada por la presente, tendrá autoridad para legislar respecto a todos esos asuntos, según lo estimare conveniente, con sujeción a las limitaciones impuestas a todos sus actos. (Enfasis nuestro.) Carta Orgánica de 1900, Documentos Históricos, supra, Sec. 13, pág. 34.
III. La ley federal de 1902 y la Reserva Militar de San Juan
La Ley Pública Núm. 249 de 1 de julio de 1902 (Ley federal de 1902) autorizó al Presidente de Estados Unidos a reservar, para usos públicos, tierras públicas y edificios pertenecientes a Estados Unidos en la isla de Puerto Rico. La ley cedió al Gobierno de Puerto Rico, para ser adminis *580 trados en beneficio del pueblo, todas las tierras públicas y los edificios que pertenecían a Estados Unidos para esa fecha, que no fueran reservadas para usos públicos por el Presidente, excluyendo específicamente los puertos, las aguas navegables y los terrenos sumergidos.([5]) De esta forma, la Ley federal de 1902 no afectó la titularidad de las aguas navegables y los terrenos sumergidos, pues los ex-cluyó expresamente tanto del requisito de ser reservados específicamente por el Presidente para permanecer bajo la jurisdicción federal como de la posibilidad de ser traspasados al Gobierno de Puerto Rico.([6])
*581 Finalmente, como condición al traspaso de estos terrenos, la ley requirió que el Gobierno de Puerto Rico renunciara a cualquier interés o reclamo en los terrenos y edificios reservados por el Presidente. La Asamblea Legislativa de Puerto Rico renunciara autorizó dicha renuncia mediante la Ley de 16 de febrero de 1903. Véase El Pueblo v. Dimas et al., supra, pág. 1074.
Utilizando la facultad que le concedió la Ley federal de 1902, el Presidente de Estados Unidos reservó ciertos terrenos conocidos como la Reserva Militar de San Juan, a través de la Orden Ejecutiva de 30 de junio de 1903 (Orden Ejecutiva de 1903). La descripción de la reserva en la or-den ejecutiva es la siguiente:
Main Reservation, San Juan, Porto Rico
All that piece or parcel of land forming the westerly and northerly portions of the island of San Juan, Porto Rico, and extending from the Marina to El Morro on the west and from the Morro to San Gerónimo on the north, said tract of land containing part of the southerly wall of the city, all of the westerly wall, and all of the northerly wall, together with Casa Blanca, the Infantry Barracks, El Morro, Artillery Park, San Cristobal, San Gerónimo, and other military lands and buildings which said tract is more particularly described as follows:
Beginning at the northwesterly corner of Tetuan and San Juan Cristo streets and running thence along said house
1. S 85° 48' W. 56.6 feet; thence
2. S 85° 48' W. 56.6 feet; thence ...
82. S. 66° 31' E. parallel to the military road and 633 feet distant therefrom 1746 feet; thence
83. S. 23° 29' W. 633 feet to the northerly line of said military road; thence crossing said military road
84. S. 23° 29 W. 1000 feet more or less to the San Antonio Channel; thence, following said channel easterly to the San Antonio Bridge; thence northerly along the shore line of the *582 Laguna to the sea in front San Gerónimo; the northerly and westerly along the sea passing Escambron, and San Cristobal to a point in line with the westerly line of the San Sebastian Bastion; .... (Énfasis nuestro.) Orden Ejecutiva de 30 de junio de 1903.
Acorde con esta descripción, la Reserva Militar de San Juan no incluyó expresamente las aguas navegables ni los terrenos sumergidos bajo ellas. Por el contrario, en la Proclama se utiliza consistentemente el vocablo “along” refiriéndose, en lo que nos concierne, a “along the shoreline” o “along the sea”. La palabra “along” significa “al lado de” y se refiere, por lo tanto, a la línea de colindancia con la playa (“shoreline”) y con el mar (“sea”). Nos parece evidente que cuando la descripción de una propiedad especifica que ésta colinda con el mar, quedan excluidas de ésta las aguas navegables y terrenos sumergidos adyacentes. Por esto, el límite de la Reserva Militar de San Juan establecida en 1903 colinda con el mar pero no incluye las aguas navegables o terrenos sumergidos adyacentes a ésta.
No obstante, la Proclama del Presidente de Estados Uni-dos de 26 de agosto de 1929, cuyo propósito fue ceder al gobierno de Puerto Rico parte de los bienes reservados en 1903, expresa que la reserva militar creada por la Orden Ejecutiva de 1903 incluyó los terrenos sumergidos colindantes con ésta.([7]) Proclama del Presidente de Estados Unidos Núm. 1889 de 26 de agosto de 1929 (Proclama de 1929). Esta proclama describió los terrenos de la reserva que eran cedidos al Gobierno de Puerto Rico de la manera siguiente:
Beginning at a point No. 84 of the Military Road, as shown on the Military Chart of the Military Reservation of San Juan, Porto Rico, and extending in a straight line N. 23° 29' E., through point No. 83 to the sea; thence easterly along the *583 shore line and outside of Fort San Gerónimo to the Laguna; thence southerly and outside of the shore line of Fort San Gerónimo, and westerly and southerly along the shore line of the Laguna to San Antonio Battery; thence along San Antonio Channel to a point where the line through points No. 83 and No. 84 intersects the channel; thence along the line N. 23° 29' E. to point No. 84, together with all the right, title, and interest of the United States in all shore and submerged lands lying shoreward of a line drawn through points Nos. 90, 91, 92 and 93, as shown on the military chart of the Military Reservation of San Juan, Porto Rico .... (Énfasis nuestro.)
Al incluir en la descripción de la Reserva Militar de San Juan los terrenos sumergidos colindantes con ésta, la Proclama de 1929 contradice la Ley federal de 1902 y la Orden Ejecutiva de 1903 que creó la reserva. Según vimos, en la Orden Ejecutiva de 1903 el Presidente de Estados Unidos no reservó expresamente las aguas navegables y los terrenos sumergidos adyacentes a la reserva militar. Además, la Ley federal de 1902 no autorizaba al Presidente a reservar dichos terrenos. Más aún, el Presidente sólo podía ejercer la facultad delegada durante el periodo de un año. Sabemos que, acorde al principio de separación de poderes, el Presidente de Estados Unidos debe ceñirse a las facultades que le son delegadas por el Congreso de Estados Unidos conforme al propósito y la intención de dicho cuerpo legislativo. Véase Youngstown Co. v. Sawyer, 343 U.S. 579 (1952). Considerado todo esto, no podemos concluir que una expresión en una Proclama Presidencial, emitida 27 años después de la Ley federal de 1902, tenga el efecto de reservar retroactivamente las aguas navegables y terrenos sumergidos que no se reservaron expresamente durante el periodo concedido para ello por el Congreso. Más aún, cuando el propósito de la Proclama de 1929 no era crear nuevas reservas o añadir terrenos a éstas, sino cederle al Gobierno de Puerto Rico terrenos reservados previamente por el gobierno federal.
Por otra parte, nos parece evidente también que el Tribunal de Primera Instancia se equivocó al basarse en un *584 documento titulado “Military Chart of the Military Reservation of San Juan, Porto Rico” para concluir que la reserva militar de 1902 incluyó las aguas navegables y los terrenos sumergidos bajo éstas. El mencionado documento no forma parte del expediente de este caso y, además, no puede ser contrario al lenguaje explícito de la propia orden ejecutiva que creó la reserva ni a la Ley federal de 1902.
IV. La Ley Jones y la Ley de Relaciones Federales
En 1917 Estados Unidos traspasó al Gobierno de Puerto Rico el control sobre las aguas navegables de la isla y los terrenos sumergidos bajo éstas, a través de la Ley Jones o Carta Orgánica de 1917. Al hacerlo, no incluyó los terrenos reservados por Estados Unidos para fines públicos. En particular, el Art. 8 de la ley expresa lo siguiente:
La superficie de los puertos y los cursos y extensiones de aguas navegables y los terrenos sumergidos bajo ellos dentro y alrededor de la Isla de Puerto Rico y de las islas y aguas adyacentes que ahora pertenecen a los Estados Unidos y no nan sido reservados por los Estados Unidos para fines públicos, quedan por la presente colocados bajo el dominio del Gobierno de Puerto Rico, para que sean administrados de la misma manera y con sujeción a las mismas limitaciones que las propiedades enumeradas en el artículo precedente; Disponiéndose, que todas las leyes de los Estados Unidos para la protección y mejoramiento de las aguas navegables de los Estados Unidos y para la conservación de los intereses de la navegación y del comercio, serán aplicables a dicha isla y aguas y a sus islas y aguas adyacentes, excepto en aquello en que las mismas sean localmente inaplicables; Disponiéndose, además, que nada de lo contenido en esta Ley se interpretará en el sentido de afectar o menoscabar de ningún modo los términos o condiciones de cualesquiera autorizaciones, permisos u otras facultades concedidos legalmente hasta ahora por el Secretario de la Guerra u otro funcionario o agente autorizado de los Estados Unidos en o en relación con dichas aguas y terrenos sumergidos en y alrededor de dicha isla y de sus islas adyacentes, o hasta este momento ejercidos legalmente en o en relación con las mismas aguas y terrenos .... (Énfasis nuestro.) Acta Jones, *585 39 Stat. 954, Documentos Históricos, Art. 8, L.P.R.A., Tomo 1, ed. 1999, pág. 81.([8])
Se desprende de esta ley federal que las aguas navegables y los terrenos sumergidos adyacentes a la Reserva Militar de San Juan fueron cedidos al Gobierno de Puerto Rico en 1917, ya que, según explicamos en la parte III de esta opinión, éstos no fueron reservados por el Presidente en 1903. En 1950, la Ley Pública Núm. 600 (64 Stat. 319) denominó a la Ley Jones o Carta Orgánica de 1917 como la Ley de Relaciones Federales con Puerto Rico, manteniendo en vigor la sección antes citada. Posteriormente, a través de la See. 606 de la Ley Pública 96-205 de 12 de marzo de 1980 (94 Stat. 91), el Congreso de Estados Unidos enmendó la Ley de Relaciones Federales para reiterar su intención de *586 cederle el dominio de las aguas navegables y los terrenos sumergidos bajo éstas al Gobierno de Puerto Rico.([9]) Dicha sección establece lo siguiente:
Notwithstanding any other provision of law, as used in this section (1) “submerged lands underlying navigable bodies of water” include lands permanently or periodically covered by tidal waters up to but not above the line of mean high tide, all lands underlying the navigable bodies of water in and around the island of Puerto Rico and the adjacent islands, and all artificially made, filled in, or reclaimed lands which formerly were lands beneath navigable bodies of water; (2) “navigable bodies of water and submerged lands underlying the same in and around the island of Puerto Rico and the adjacent islands and water” extend from the coastline of the island of Puerto Eico and the adjacent islands as heretofore or hereafter modified by accretion, erosion or reliction, seaward to a distance of three marine leagues; (3) “control” includes all right, title, and interest in and to and jurisdiction and authority over the submerged lands underlying the harbor areas and navigable streams and bodies of water in and around the island of Puerto Rico and the adjacent islands and waters, and the natural resources underlying such submerged lands and waters, and includes proprietary rights of ownership, and the rights of management, administration, leasing, use, and development of such natural resources and submerged lands beneath such waters”. (Énfasis nuestro.) 48 U.S.C.A. sec. 749.([10])
El historial legislativo de la ley no deja dudas respecto a la intención del Congreso de Estados Unidos de conceder a Puerto Rico los mismos derechos que tienen los estados de la Unión y otros territorios de Estados Unidos sobre sus aguas navegables y terrenos sumergidos. A esos fines, el informe del Comité del Senado federal expresa lo siguiente:
This section, proposed by Senator Jackson, would confirm the jurisdiction of Puerto Rico over its submerged lands to three marine leagues. This jurisdiction was conferred on Puerto Rico by sections 7 and 8 of the Organic Act of 1917 (“Jones Act”) *587 which transferred to the administration of the Government of Puerto Rico control over lands acquired by the United States from Spain through the Treaty of Paris in 1899.
Puerto Rico’s jurisdiction and control has been evidenced since 1917 and as recently as 1974, in commenting on the Territorial Submerged Lands Act, the formal administration report stated in part that “Puerto Rico, pursuant to 48 U.S.C. 749, controls the submerged lands around the islands of Puerto Rico.” In order to prevent any unintentional exclusion of Puerto Rico from the measure since the Commonwealth is not included in either the Submerged Lands Act or the Territorial Submerged Lands Act, Senator Johnston, Chairman of the Subcommittee on Territories and Insular Affairs, at the request of then Governor Rafael Hernandes Colon [sic] and Resident Commissioner Jaime Benitez requested further confirmation of Puerto Rico’s jurisdiction. The Director of the Office of Territorial Affairs testified that “by Act of Congress in 1917 (48 U.S.C. 749) the Government of Puerto Rico obtained control of its submerged lands. As far as we are aware, Puerto Rico’s administration of its submerged lands had been quite smooth.”
Although the precise seaward jurisdiction was not as explicitly stated in the 1917 Act for Puerto Rico as was later done for the States under the Submerged Lands Act and, for the territories under the Territorial Submerged Lands Act, the basis for such jurisdiction rests on grounds similar to those asserted by Texas and Florida based on Spanish Law and custom. The grant to Puerto Rico in 1917, therefore, was three leagues. The amendment merely confirms the action of the United States taken in 1917 by conforming the language of the 1917 Act to the language of the Submerged Lands Act and the Territorial Submerged Lands Acts. (Énfasis nuestro.) S. Rep. 96-467, 1980, U.S.C.C.A.N. 135.([11])
A través de la Ley de Relaciones Federales y sus enmiendas, el Congreso de Estados Unidos ha reiterado su intención de cederle al Gobierno de Puerto Rico el control de sus aguas navegables y terrenos sumergidos hasta tres leguas marinas alrededor de la isla e islas adyacentes, con excepción de aquellos terrenos que Estados Unidos haya reservado para usos públicos. La ley especifica que el concepto *588 “terrenos sumergidos” incluye los terrenos ganados al mar mediante relleno y, además, establece que el término “control” comprende todo derecho, título, interés, jurisdicción y autoridad sobre estos terrenos.
Finalmente, el Congreso dispuso que todas las leyes federales para la protección y el mejoramiento de las aguas navegables de Estados Unidos y para la conservación de los intereses de la navegación y comercio aplicarán a Puerto Rico y sus aguas navegables, a menos que éstas sean localmente inaplicables/[12]) Posteriormente veremos la importancia de esta legislación en cuanto al dominio sobre los terrenos ganados al mar en controversia.
V. El traspaso de la Reserva Militar de San Juan al Departamento de la Marina y el arrendamiento a Virgil Baker
En 1919 el Departamento de Guerra de Estados Unidos traspasó parte de los terrenos de la Reserva Militar de San Juan al Departamento de la Marina de Estados Unidos, llamándola entonces Reserva Naval San Jerónimo. Esta reserva fue inscrita en el Registro de la Propiedad a favor de Estados Unidos.
Posteriormente, a través de la Ley Pública Núm. 35 de 12 de jimio de 1921, el Congreso de Estados Unidos autorizó al Secretario del Departamento de la Marina a arrendar o traspasar los terrenos bajo su control/[13]) El 15 de julio de *589 1921, el Secretario de la Marina de Estados Unidos firmó un contrato de arrendamiento con el Teniente Comandante de la Marina retirado, Virgil Baker. A través de este contrato, cuya vigencia sería de 999 años, la Marina de Estados Uni-dos arrendó parte de la Reserva Militar de San Juan, específicamente una porción de terreno localizado en la Reserva Naval de San Gerónimo, descrita como sigue:
Site of Land bounded on the North by the Sea, on the East by the small Inlet known as the Laguna, on the South by the main Naval Reservation from which said Site is segregated, and on the West by a tract of land belonging to the TREASURY DEPARTMENT of the UNITED STATES and by the Military Reservation of San Juan, Porto Rico ....
El contrato fue inscrito en el Registro de la Propiedad y, en lo pertinente, establece lo siguiente:
In accordance with the desire of the PARTY OF THE FIRST PART this LEASE is granted in lieu of the complete Transfer of Title provided for previous agreements hereinbefore mentioned, and is accepted by the PARTY OF THE SECOND PART in complete and entire satisfaction of all such previous agreements. It is also mutually understood and agreed that this LEASE is NOT REVOCABLE EXCEPT BY MUTUAL AGREEMENT OF BOTH PARTIES, but that the NAVY DEPARTMENT SHALL RETAIN TITLE TO SAID SITE OF LAND, and in accordance with the Provisions of the ACT OF CONGRESS authorizing the grant of this LEASE, it is mutually understood and agreed that the NAVY DEPARTMENT SHALL HAVE, IN TIME OF WAR OR NATIONAL EMERGENCY, IF NECESSARY, FREE AND UNLIMITED USE, WITHOUT^ COST, OF THE SITE OF LAND HEREIN, LEASED. (Énfasis nuestro.)
En 1928 el Gobierno de Estados Unidos demandó para anular el contrato, alegando fraude. El Pueblo de Puerto Rico intervino en el pleito reclamando ser el titular de los terrenos sumergidos colindantes a los terrenos incluidos en el arrendamiento. Eventualmente, el caso llegó al Tribunal de Apelaciones para el Primer Circuito y dicho foro sostuvo la validez del contrato. Sobre el asunto de la titularidad de *590 los terrenos sumergidos, reconoció que había controversia entre la alegación del Pueblo de Puerto Rico y la aseveración de título de Estados Unidos. No obstante, el tribunal apelativo federal decidió que no era necesario resolver la reclamación del Pueblo de Puerto Rico, ya que el teniente comandante Baker había cedido voluntariamente cualquier derecho, título o interés que pudiera tener sobre los terrenos sumergidos adyacentes a los terrenos que le fueron arrendados.([14])
VI. La Proclama del Presidente de Estados Unidos de 1929 y la reserva militar de cinco acres o “Coast Guard Parcel”
Según mencionamos en la parte III de esta opinión, el 26 de agosto de 1929, mediante una proclama dictada en el ejercicio de su facultad bajo el Art. 7 de la Ley de Relaciones Federales, L.P.R.A., Tomo 1, ed. 1999, pág. 217, el Presidente de Estados Unidos traspasó al Pueblo de Puerto Rico todo derecho, título e interés de Estados Unidos sobre los terrenos de la Reserva Naval San Jerónimo, incluyendo aquellos arrendados al señor Baker. La Proclama de 1929 cedió al Pueblo de Puerto Rico los terrenos que el Presi *591 dente de Estados Unidos había reservado a través de la Orden Ejecutiva de 1903. En la parte III de esta opinión explicamos que si bien la Proclama de 1929 incluye los terrenos sumergidos en la descripción de la reserva, estos terrenos realmente nunca fueron incluidos en la reserva. Además, el Congreso de Estados Unidos había cedido dichos terrenos sumergidos al Gobierno de Puerto Rico desde 1917, a través de la Ley de Relaciones Federales. Véase la parte IV de esta opinión.
Ahora bien, en su proclama, el Presidente de Estados Unidos excluyó de los terrenos cedidos a Puerto Rico una reserva militar de alrededor de cinco acres sobre la cual el gobierno federal mantuvo jurisdicción. La Proclama describe este terreno como sigue:
... southerly of and contiguous to the tract heretofore leased to Virgil Baker, and bounded on the north by the southerly line of the said Virgil Baker tract, being a straight line drawn from the point known as Point 85 at the southwesterly corner of the Virgil Baker tract, easterly along the southerly line of said Virgil Baker tract through Point No. 86 to the Laguna; on the west by a straight line drawn southerly from said Point 85 along the westerly line of the tract hereby conveyed; on the east by the shore line of the Laguna; and on the south by the northerly line of a proposed road the course and location of which road are to be fixed hereafter. The United States retains title to and jurisdiction over the said last mentioned five acre tract.
La reserva militar de alrededor de cinco acres establecida en la proclama de 1929, mejor conocida como la Coast Guard Parcel, fue retenida por el Presidente de Estados Unidos para que el Departamento de la Marina desarrollara en ella servicios de comunicación. Contrario a la descripción de los terrenos cedidos a Puerto Rico, la descripción de esta reserva no incluyó los terrenos sumergidos colindantes con ésta. No hubo, pues, intención de reservar estos terrenos *592 sumergidos. Abona a nuestra conclusión el que la reserva original creada en 1903 tampoco los incluía.([15])
VII. Rellenos o terrenos ganados al mar aledaños al Coast Guard Parcel
El 2 de julio de 1940 el Congreso de Estados Unidos aprobó la Ley Pública Núm. 703. Esta ley autorizó al Secretario de Guerra, entre otras cosas, a llevar a cabo las construcciones y mejoras necesarias en las distintas localidades militares.([16]) En el caso de autos, el Tribunal de Primera Instancia se basó en esta ley para concluir que las obras de relleno de los terrenos sumergidos aledaños a la “Coast Guard Parcel” constituían un ejercicio de expropiación forzosa del gobierno federal. Esta interpretación no puede sostenerse. No se desprende de la Ley Pública Núm. 703 de 1940 el propósito de expropiar terreno alguno. Tampoco se llevó a cabo proceso alguno de expropiación al amparo de dicha ley. Según surge del expediente, el gobierno federal *593 nunca tuvo la intención de expropiar dichos terrenos; simplemente autorizó al Secretario de Guerra a destinar recursos para las obras que fueran necesarias en el “Coast Guard Parcel” y adquirir los terrenos para llevarlas a cabo.
En diciembre de 1940 la Marina de Estados Unidos solicitó la autorización del Departamento de Guerra de Estados Unidos, la Comisión de Servicio Público de Puerto Rico y el Departamento del Interior de Puerto Rico para rellenar un área de los terrenos sumergidos aledaños al “Coast Guard Parcel”. Estas tres solicitudes de permisos confirman que el gobierno federal no tuvo la intención de expropiar los terrenos sumergidos aledaños al “Coast Guard Parcel”. Más aún, la solicitud de permiso dirigida a la Comisión de Servicio Público de Puerto Rico, el 4 de diciembre de 1940, manifestó que se requería que el Gobierno de Puerto Rico aprobara la obra propuesta. De esta forma, se reconoció expresamente que dichos terrenos eran propiedad del Gobierno de Puerto Rico desde 1917, según las disposiciones de la Ley de Relaciones Federales.
El 18 de diciembre de 1940 el Comisionado Interino del Departamento del Interior de Puerto Rico, Sr. José G. Bloise, envió una carta al Secretario de la Comisión del Servicio Público en la que endosó las obras de relleno propuestas y reiteró que los terrenos sumergidos adyacentes al “Coast Guard Parcel” eran propiedad del Gobierno de Puerto Rico desde 1917. En lo pertinente, dicha carta expresa lo siguiente:
Allow me to call your attention to the fact that the submerged lands comprised in the construction of said dike and fill belong to the People of Puerto Rico, according to Article 8th of the Organic Act approved by the Congress of the United States of America on March 2nd, 1917, and also by Proclamation No. 1889 of the President of the United States of America, dated August 26th, 1929.([17])
*594 Además, el Comisionado Interino recomendó al Departamento de la Marina de Estados Unidos que solicitara al Gobernador de Puerto Rico la transferencia de dichos terrenos al gobierno federal.([18])
El 7 de enero de 1941 la Comisión de Servicio Público de Puerto Rico aprobó el permiso solicitado. En una carta de 27 de enero de 1941, el Cuerpo de Ingenieros de Estados Unidos recomendó aprobar el permiso. El 10 de febrero de 1941 el Departamento de Guerra de Estados Unidos autorizó el relleno. El 25 de febrero de 1941 el Cuerpo de Ingenieros de Estados Unidos notificó de ello al Capitán del Puerto de San Juan, a la Comisión de Servicio Público y al Comisionado del Departamento del Interior de Puerto Rico. Las obras de relleno se terminaron el 1 de octubre de 1941 y una inspección que llevó a cabo el Departamento de Guerra de Estados Unidos confirmó que las obras se hicieron conforme a los permisos. Véase Memorando del 4 de diciembre de 1941 respecto a Pmts. PR 170/6 del Departamento de Guerra de Estados Unidos.
VIII. El dominio sobre los terrenos aledaños al “Coast Guard Parcel” ganados al mar bajo la jurisdicción federal
Aclarada la manera en que se crearon los terrenos ganados al mar aledaños al “Coast Guard Parcel”, debemos *595 abordar la controversia de su titularidad. Para ello, es necesario precisar el derecho aplicable.
Según quedó establecido, al momento en que se llevaron a cabo las obras de relleno en los terrenos sumergidos colindantes al “Coast Guard Parcel”, el gobierno federal era el titular de dicha parcela. Por ser ese el caso, la titularidad de dichos terrenos debe determinarse conforme al derecho federal. Así lo resolvió el Tribunal Supremo de Estados Unidos en California State Lands Comm’n v. United States, 457 U.S. 273, 278 (1982), cuando dispuso que toda controversia respecto a los terrenos costeros que sean propiedad de Estados Unidos debe resolverse de acuerdo con el derecho federal. A esos efectos, afirmó que el Derecho federal se aplicará mientras Estados Unidos sea el titular del terreno costero y mantenga su interés sobre éste.([19]) Quiere ello decir que para determinar la titularidad de los terrenos ganados al mar aledaños al “Coast Guard Parcel”, al momento cuando se rellenaron esos terrenos, debemos recurrir al derecho federal, y no al Derecho puertorriqueño.
Ya vimos que una ley federal, la Ley de Relaciones Federales, contiene disposiciones aplicables a los terrenos ganados al mar en Puerto Rico. Según esta ley, Puerto Rico tiene todo derecho, título, interés, jurisdicción y autoridad sobre los terrenos ganados al mar mediante relleno alrededor de la isla e islas adyacentes, con excepción de aquellos que Estados Unidos hayan reservado para usos públicos. 48 U.S.C.A. sec. 749.([20]) Véase, además, la parte IV de esta *596 opinión. Esto, sin embargo, no resuelve la controversia particular que nos ocupa, pues cuando los terrenos sumergidos aledaños al “Coast Guard Parcel” fueron rellenados en 1940, la parcela colindante a dichos terrenos pertenecía al Gobierno de Estados Unidos y la jurisprudencia del Tribunal Supremo federal requiere, según vimos, que recurramos a la legislación federal y, en su defecto, al derecho común federal (“federal common law”) para resolver las dudas sobre la titularidad en estas circunstancias. California State Lands Comm’n v. United States, supra, págs. 282-284.([21])
*597 En California State Lands Comm’n v. United States, supra, el Tribunal Supremo federal abordó una controversia sobre la titularidad de unas accesiones que se crearon paulatinamente sobre unos terrenos sumergidos del estado de California. La parcela de terreno colindante a éstas era una reserva militar de la Guardia Costanera de Estados Unidos. La controversia del caso requería determinar si dichos terrenos formados por accesión de manera paulatina pertenecían al Gobierno de Estados Unidos o al estado de California. El Tribunal Supremo federal resolvió la controversia a favor de Estados Unidos aplicando el “Submerged Lands Act”, 43 U.S.C.A. secs. 1301-1315. Sin embargo, aclaró que aunque no fuera aplicable esa legislación, el derecho común federal desplazaría al derecho estatal de California, con la consecuencia de que las accesiones serían de Estados Unidos en virtud de los derechos reconocidos bajo el derecho común federal a los dueños del litoral o parcelas colindantes. California State Lands Comm’n v. United States, supra, pág. 284.
Sin embargo, esta norma de derecho común federal sólo se refiere a las accesiones paulatinas o imperceptibles causadas natural o artificialmente. Específicamente, el Tribunal Supremo federal definió la accesión que estaba en controversia en California State Lands Comm’n v. United States, supra, pág. 287, de la manera siguiente: “gradual process by which sand accumulated along the shore, although caused by a jetty affecting the action of the sea.” (Enfasis nuestro.) Véase United States v. State of Washington, 294 F.2d 830 (1961). Ahora bien, según indica el Tribunal de Apelaciones de Estados Unidos para el Tercer Circuito en Alexander Hamilton Life Ins. Co. v. Govt. of V.I., 757 F.2d 534, 538-539 (1985): “there is a distinct body of common law relating to the ownership of artificially created fastlands.” Específicamente, el derecho común federal *598 ha establecido que el propietario costero no obtiene la propiedad sobre los terrenos resultantes del relleno de terrenos sumergidos por el mero acto de depositar o causar el depósito de dicho relleno. Véanse: New Jersey v. New York, 523 U.S. 767 (1998); Georgia v. South Carolina, 497 U.S. 376 (1990); Alexander Hamilton Life Ins. Co. v. Govt. of V.I., supra, págs. 538-539; Burns v. Forbes, 412 F.2d 995 (1969); Marine Ry. Co. v. United States, 257 U.S. 47 (1921).
En el caso Alexander Hamilton Life Ins. Co. v. Govt. of V.I., supra, el tribunal apelativo federal discutió con mayor profundidad esta norma y señaló que el propietario costero adquirirá el título sobre el terreno cuando lleva a cabo el relleno con la debida autorización. Específicamente, el tribunal explica lo siguiente:
Where the reclamation and filling of the adjacent shore or submerged soil was expressly permitted by legislative enactment, pr was authorized by a statute fixing a bulkhead, harbor, or dock line, or similar statute, or by a valid license or permit or by local common law, it has usually been held or recognized that filled land created by a riparian or littoral proprietor belongs to him as part of the upland, at least where the public rights with respect to navigation and commerce are not substantially impaired. íd., pág. 546. Véase United States v. Groen, 72 F. Supp. 713 (1947). Véase, además, Anno: Accretions by Filling or Dredging, 91 A.L.R.2d Sec. 2[b] 857, 867.
El tribunal aclara que esta norma no aplicará si el permiso o la autorización dispone expresamente que el propietario original de los terrenos sumergidos retendrá la titularidad de éstos una vez se lleven a cabo las obras de relleno. Sobre esta situación, el tribunal apelativo federal explica lo siguiente:
[T]he rationale behind this common law rule is that one who obtains permission to improve his property should be able to rely on the government’s expression of approval for the knowledge that he will become the owner in fee simple of any such improvements. Given an express provision in the instrument of authorization to the contrary, however, that landowner is no longer entitled to rely on the authorization for the *599 transfer of property rights. Alexander Hamilton Life Ins. Co. v. Govt. of V.I., supra, pág. 547.
Según el expediente del caso que nos ocupa, el gobierno federal obtuvo los permisos necesarios para llevar a cabo las obras de relleno en los terrenos sumergidos aledaños al “Coast Guard Parcel”. Además, ninguno de los permisos otorgados expresó que el Gobierno de Puerto Rico retendría sobre esos terrenos el dominio que era suyo desde 1917. Por eso, según el derecho común federal aplicable al momento cuando se rellenaron los terrenos, éstos pasaron a ser propiedad del Departamento de la Marina de Estados Unidos y estuvieron sujetos a la jurisdicción federal durante alrededor de 50 años (1941-1991).
IX. Adquisición de los terrenos ganados al mar aledaños al “Coast Guard Parcel” por el Gobierno de Puerto Rico
En 1973 el Departamento de la Marina de Estados Uni-dos transfirió el “Coast Guard Parcel” a la Guardia Costera de Estados Unidos. Véase Disposal Report No. 439 de 28 de septiembre de 1973. El 21 de mayo de 1990, en respuesta a una solicitud de información del Gobierno de Puerto Rico sobre la titularidad de esa parcela, la Administración de Servicios Generales le envió ciertos estudios de título y un memorando de la Guardia Costera de Estados Unidos, en el que se concluye que el Gobierno federal era dueño de los terrenos ganados al mar en dicha parcela desde 1941.
El 20 de julio de 1990 el Gobernador de Puerto Rico para esa fecha, Hon. Rafael Hernández Colón, escribió al Presidente de Estados Unidos solicitándole que, según la autoridad conferida a éste por la See. 7 de la Ley de Relaciones Federales, supra, cediera el “Coast Guard Parcel” y los terrenos sumergidos aledaños a ésta al Gobierno de Puerto Rico, ya que la Guardia Costera de Estados Unidos *600 la había desalojado y la Administración de Servicios Generales de Estados Unidos tenía planes de venderla([22])
El 4 de septiembre de 1990 el Gobierno de Estados Uni-dos contestó la petición del Gobernador de Puerto Rico informándole que la Administración de Servicios Generales no le cedería el “Coast Guard Parcel” al Gobierno de Puerto Rico, sino que estaba en disposición de vendérsela. La carta indica lo siguiente:
The relocation and sale of the San Gerónimo Housing Area will be highly beneficial to the Commonwealth of Puerto Rico and the Federal Government. We would like to continue negotiations with the Commonwealth for the purchase of this property as soon as possible. Otherwise, we have no choice but to offer the property for sale to the general public on a competitive bid basis. (Enfasis nuestro.)
El 4 de octubre de 1990 el entonces Secretario del Departamento de Justicia de Puerto Rico, Lie. Héctor Rivera Cruz, le informó a la Administración de Servicios Generales que el Gobierno de Puerto Rico presentaría una demanda contra Estados Unidos para lograr que el “Coast Guard Parcel” y los terrenos ganados al mar adyacentes a ésta fueran cedidos a Puerto Rico, según la See. 7 de la Ley de Relaciones Federales, supra. Esto con el fin de evitar que el gobierno federal vendiera la parcela a una tercera persona, según lo había advertido en la carta del 4 de septiembre de ese año.
El gobierno federal respondió a la carta del Secretario de Justicia de Puerto Rico el 16 de noviembre de 1990, recomendando que se llevaran a cabo negociaciones para *601 llegar a un acuerdo aceptable a ambas partes. El 14 de febrero de 1991, un memorando interno de la Oficina del Gobernador de Puerto Rico que consta en autos indica al gobernador Hernández Colón que al Gobierno de Puerto Rico le convenía más comprar la parcela que envolverse en un litigio sobre titularidad. En cuanto a esto, el memorando expresa lo siguiente:
[E]l ELA no podrá adquirir dicha propiedad litigando ya que aunque el Tribunal Federal interprete la ley a favor nuestro, los Estados Unidos podrían derrotar nuestro propósito ubicando en dichas facilidades algún personal o equipo del Coast Guard, aunque éste sea ínfimo.
Aunque este asunto había sido discutido previamente con usted, traigo nuevamente a su atención el mismo. En tasación hecha por la Administración de Terrenos, se valoró la propiedad en 10.73 millones. La oferta inicial de GSA era de 6.8 millones. Ante esta situación, sugiero se autorize [sic] al licenciado Pérez [para entonces Secretario de Justicia] a negociar con GSA un descuento de 50% de nuestro precio de tasación; lo que equivaldría aproximadamente a unos 5 millones.
El 22 de agosto de 1991 la Administración de Terrenos de Puerto Rico notificó al gobierno federal que compraría la propiedad para beneficio del Pueblo de Puerto Rico. En dicha comunicación el Gobierno de Puerto Rico afirmó que la adquisición de los terrenos serviría al interés público asegurando un buen manejo de la propiedad y la protección de la zona costera. Además, señaló que la Administración de Terrenos planificaba el manejo público de la propiedad y no la venta o traspaso a personas privadas. Específicamente, la carta expresó lo siguiente:
The Puerto Rico Land Administration, an agency of the Commonwealth of Puerto Rico, is purchasing the San Gerónimo property for the benefit of the people of the Commonwealth. The public interest will be served by ensuring controlled management of the property and shoreline protection.
The Land Administration at this time envisions public management of the property and has not selected a private firm for any future development. (Énfasis nuestro.)
*602 Para determinar el efecto de esta transferencia sobre la titularidad de los terrenos, debemos acudir una vez más a la jurisprudencia federal. En el caso State Land Board v. Corvallis Sand & Gravel Co., 429 U.S. 363 (1977), el Tribunal Supremo federal resolvió que una vez el interés federal sobre una propiedad se ha extinguido de acuerdo con las leyes de Estados Unidos, dicha propiedad estará sujeta al derecho estatal. Al respecto, el tribunal explica lo siguiente:
We hold the true principle to be this, that whenever the question in any Court, state or federal, is whether a title to land which had once been property of the United States has passed, that question must be resolved by the laws of the United States; but that whenever, according to these laws, the title shall have passed, then that property, like all other property in the state, is subject to state legislation; so far as that legislation is consistent with the admission that the title passed and vested according to the laws of the United States. (Enfasis nuestro y en el original.) State Land Board v. Corvallis Sand & Gravel Co., supra, pág. 377, citando a Wilcox v. Jackson, 13 Pet. 498, 517 (1839).([23])
Según lo requiere esta norma federal, el contrato de compraventa celebrado entre ambos gobiernos el 21 de noviembre de 1991 se redactó conforme a las exigencias de las leyes y regulaciones de Estados Unidos. Así lo indica expresamente el contrato en una de sus cláusulas, que dispone lo siguiente: “the parties hereto desire to consúmate the sale in accordance with applicable law and regulation of the United States of America.” (Enfasis nuestro.) El precio de com *603 praventa fue 4.8 millones de dólares, menos de la mitad del valor de tasación, según informado en el antes citado memorando al gobernador Hernández Colón.
A través de este contrato, el gobierno federal cedió al gobierno de Puerto Rico todo derecho, título e interés sobre la propiedad. De esa forma, el interés federal sobre los terrenos ganados al mar aledaños al “Coast Guard Parcel” desapareció conforme a las leyes y regulaciones de Estados Unidos y dichos terrenos entraron a nuestra jurisdicción. En particular, entraron a nuestra jurisdicción bajo la administración de la Rama Ejecutiva de nuestro gobierno.
Una vez los terrenos ganados al mar aledaños al “Coast Guard Parcel” entraron a la administración de Puerto Rico, la Rama Ejecutiva del Gobierno de Puerto Rico tenía la obligación de administrarlos según el derecho aplicable en nuestra jurisdicción, conforme explicó el Tribunal Supremo federal en el caso de State Land Board v. Corvallis Sand & Gravel Co., supra. Decidir lo contrario nos llevaría a concluir que el derecho de Estados Unidos continúa vigente sobre unos terrenos costeros que hace diecisiete años fueron liberados del interés federal.
Veamos entonces cuál era el derecho aplicable a los terrenos ganados al mar en controversia al momento en que éstos entraron a nuestra jurisdicción.
En primer lugar, sabemos que las leyes de puertos vigente en Puerto Rico cuando se llevaron a cabo las obras de relleno en 1941 no regularon la titularidad de los terrenos, pues según ya explicamos, en aquel momento los terrenos ganados al mar estaban bajo la jurisdicción federal y el Derecho aplicable era el de Estados Unidos. Nótese que la desafectación de estos terrenos en 1941 ocurrió en protección del interés federal, acorde con el ordenamiento jurídico de dicha jurisdicción.
En 1991, cuando se traspasan los terrenos a la jurisdicción de Puerto Rico, la ley aplicable vigente era la Ley *604 de Puertos de 1968, Ley de Muelles y Puertos de Puerto Rico de 1968 (23 L.P.R.A. sees. 2101-2801). Según ésta, los siguientes bienes inmuebles son bienes de dominio público, ya que están incluidos en la zona marítimo-terrestre:
[E]l espacio de las costas de Puerto Rico que baña el mar en su flujo y reflujo, en donde son sensibles las mareas, y las mayores olas en los temporales en donde las mareas no son sensibles, e incluye los terrenos ganados al mar y las márgenes de los ríos hasta el sitio en que sean navegables o se hagan sensibles las mareas; y el término, sin condicionar, significa la zona marítimoterrestre de Puerto Rico. (Enfasis nuestro.) Art. 1, Sec. 1.03 de la Ley de Puertos de 1968 (23 L.P.R.A. sec. 2103(n)).
Se desprende de esta disposición que según la Ley de Puertos de 1968 los terrenos ganados al mar son bienes de dominio público.
En segundo lugar, según la Sec. 2.02 del Reglamento de Zonificación Especial del Condado de 1986, Reglamento Núm. 3319 de la Junta de Planificación de 7 de junio de 1986, el “Coast Guard Parcel” se zonificó como una zona pública o recreativa (P). Por lo tanto, al momento de entrar a nuestra jurisdicción, el “Coast Guard Parcel” tenía una zonificación de zona pública o recreativa y los terrenos ganados al mar aledaños a ésta eran bienes de dominio público, según la Ley de Puertos de 1968.
La opinión mayoritaria concluye que el que se adquirieran los terrenos ganados al mar en controversia en este caso mediante contrato de compraventa con Estados Uni-dos conlleva, de por sí, el que dichos terrenos pasaran a ser patrimoniales del Estado y que, por lo tanto, se requería un acto afirmativo de afectación al dominio público para que dejaran de serlo. Por el contrario, al extinguirse el interés federal y aplicar por primera vez nuestro ordenamiento a los terrenos ganados al mar aledaños al “Coast Guard Parcel”, la Ley de Puertos de 1968 estableció una afectación expresa al dominio público sobre dichos terrenos, que como veremos en la parte XI de esta opinión, sólo *605 podía derrotarse por un acto legislativo de desafectación. ([24]) Además, las cartas, los memorandos y el propio contrato de compraventa demuestran que el Gobierno de Puerto Rico optó por comprar porque según las leyes, los reglamentos y las exigencias de la jurisdicción federal, no tenía otra forma de adquirir estos terrenos. El contrato de compraventa entre los gobiernos de Estados Unidos y Puerto Rico fue sólo el instrumento formal a través del cual el gobierno federal aceptó ceder su interés sobre los terrenos en controversia. Por eso, según ya explicamos, desde que nuestro gobierno adquirió los terrenos ganados al mar cumpliendo con las condiciones establecidas por las leyes y los reglamentos federales, dichos terrenos están sujetos a nuestro ordenamiento. De esa forma, les aplica la afectación de bienes de dominio público que establece la Ley de Puertos de 1968. State Land, Board v. Corvallis Sand & Gravel Co., supra, pág. 377, citando a Wilcox v. Jackson, supra.
Se desprende claramente del expediente que durante todo el proceso de negociación con el gobierno federal el Gobierno de Puerto Rico tuvo la intención de dedicar los terrenos adquiridos al uso público y protección de las costas. Dicha intención se evidencia específicamente en la carta enviada por la Administración de Terrenos al gobierno federal el 22 de agosto de 1991, en la que informó lo siguiente:
The Puerto Rico Land Administration, an agency of the Commonwealth of Puerto Rico, is purchasing the San Gerónimo property for the benefit of the people of the Commonwealth. The public interest will be served by ensuring controlled management of the property and shoreline protection.
The Land Administration at this time envisions public management of the property and has not selected a private firm for any future development. (Enfasis nuestro.)
Abona a nuestra conclusión el que la reglamentación vigente a la fecha de la adquisición zonificara al “Coast *606 Guard Parcel” como una zona pública o recreativa, o ambas (P). Sin embargo, la opinión mayoritaria concluye que el expediente no provee evidencia que demuestre que al momento de la adquisición el Gobierno de Puerto Rico destinase los terrenos a un uso público determinado.
Abordemos ahora la controversia sobre la titularidad de los terrenos ganados al mar en la segunda parcela objeto de este litigio, la parcela conocida como “Condado Bay Parcel”. Para ello, debemos remontarnos nuevamente a la Proclama Presidencial de 1929, a través de la cual el gobierno federal cedió las parcelas colindantes a dichos terrenos al Gobierno de Puerto Rico.
X. El dominio sobre los terrenos ganados al mar en el “Con-dado Bay Parcel”
Según explicamos en la parte III y VI de esta opinión, el 26 de agosto de 1929 el Presidente de Estados Unidos emitió una proclama mediante la cual traspasó al Pueblo de Puerto Rico todo derecho, título e interés de Estados Unidos sobre los terrenos de la Reserva Naval San Gerónimo, incluyendo los arrendados al señor Virgil Baker. Posteriormente, el Hotel Caribe Hilton fue construido en parte de estos terrenos.
En 1949 el Gobierno de Puerto Rico presentó una demanda de expropiación para recuperar aquellos terrenos sobre los cuales el señor Baker mantenía control en calidad de arrendatario, aunque el título de propiedad sobre ellos había pasado al Gobierno de Puerto Rico mediante cesión en 1929. En la demanda de expropiación, el Gobierno de Puerto Rico alegó lo siguiente:
Que el interés que El Pueblo de Puerto Rico se propone adquirir en la propiedad objeto de este procedimiento es el uso y disfrute de la misma durante el término del arrendamiento otorgado al señor Virgil Baker y su esposa Stella May Baker, por el Secretario interino de la Marina de los Estados Unidos, Theodore Roosevelt, el día 15 de julio de 1921, ahora subarrendada a la San Gerónimo Development Co. Inc. (Énfasis *607 nuestro.) Demanda de 18 de noviembre de 1949 (Pueblo Rico v. Virgil Baker), Caso Núm. 307, pág. 2.
El 28 de agosto de 1956 el Gobierno de Puerto Rico compensó al señor Baker y obtuvo todos los derechos sobre la propiedad.
En la década de los cincuenta, la Compañía de Fomento Industrial de Puerto Rico decidió ampliar el Hotel Caribe Hilton, para lo cual presentó una Consulta de Ubicación ante la Junta de Planificación de Puerto Rico. El 22 de junio de 1955 la Junta de Planificación aprobó la consulta y, entre otras cosas, autorizó que se rellenaran los terrenos sumergidos aledaños a la parcela que Estados Unidos había arrendado al señor Baker y que fue cedida al Gobierno de Puerto Rico en 1929. Los terrenos así rellenados o ganados al mar constituyen la parcela denominada “Condado Bay Parcel”. Hoy día, se construye parte del proyecto en controversia, Paseo Caribe, sobre dicha parcela. Por lo tanto, es necesario analizar la titularidad de estos terrenos según el derecho aplicable al “Condado Bay Parcel” al momento en que se llevaron a cabo las obras de relleno en la década de los cincuenta.
Nuestro derecho sobre los bienes de dominio público marítimo terrestres proviene del Derecho romano y el Derecho civil español. Por esto, debemos examinar en cierto detalle las políticas públicas a las que responden estas nor-mas jurídicas en las que se basa nuestro ordenamiento.
En el Derecho romano, el mar y sus riberas eran cosas comunes que pertenecían a todas las personas en general y a ninguna en particular. Esto, contrario a las cosas públicas que pertenecían al Estado y eran destinadas al uso público. Martínez Escudero explica:
Las riberas del mar no son en el Derecho romano, como hemos visto, cosas públicas, sino cosas comunes, cuya naturaleza jurídica es diferente. En efecto, las res comunes omnium no pertenecen al populus romanus, como las res publicae, ni a las ciudades, como las res universitatis, sino son cosas que por su ius gentium pertenecen a todos los hombres *608 en general y a ninguno en particular. (Escolio omitido.) L. Martínez Escudero, Playas y costas: su régimen jurídico administrativo, 2da ed. rev., Madrid, Ed. Montecorvo, 1985, págs. 28-29.
Fundamentándose en el Derecho romano, la Ley III del Título XXVIII de la Partida III de las Siete Partidas, establece que el mar y sus riberas son cosas comunes. En lo pertinente, dicha ley dispone:
Las cosas que comunalmente pertenecen a todas las criaturas que bien eneste mundo son estas, el ayre, e las aguas déla lluvia, e el mar, e su ribera. (Enfasis nuestro.) I. Miralles González, Dominio público y propiedad privada en la nueva Ley de Costas, Barcelona, Ed. Civitas, 1992, pág. 21. Véase, además, Martínez Escudero, op. cit., págs. 30-33.
El Derecho civil español moderno se apartó de esta doctrina cuando clasificó el mar litoral, la zona marítima y las playas como bienes de dominio público bajo la Ley de Aguas del 3 de agosto de 1866 (Ley de Aguas de 1866), Colección Legislativa de España, Madrid, 1866, T. 9, 2da parte, pág. 294. Véase Miralles González, op. cit., pág. 24. Según los Arts. 1 y 4 de dicha ley, las costas, las fronteras marítimas, el mar litoral, la zona marítima, las playas, los terrenos sumergidos bajo éstos y las accesiones o aterramientos que ocasionara el mar son bienes de dominio público. Adviértase que esta clasificación no incluyó los terrenos ganados al mar.([25])
*609 En Rubert Armstrong v. E.L.A., supra, explicamos que la Exposición de Motivos de la Ley de Aguas de 1866 caracterizó a los bienes de dominio público como bienes inalienables e imprescriptibles. En particular, citamos el siguiente fragmento de la Exposición de Motivos de la ley:
Por dominio público de la Nación entiende al que a ésta compete sobre aquellas cosas cuyo uso es común por su propia naturaleza o por el objeto a que se hallan destinadas; tales son, por ejemplo, las playas, ríos, caminos, muelles y puertos públicos; su carácter principal es ser inenajenable e imprescriptible. Y por dominio particular del Estado entiende el gue a éste compete sobre aquellas cosas destinadas a su servicio, o sea, a la satisfacción de sus necesidades colectivas, y no al uso común, cosas de las que dispone como los particulares de las que constituyen su patrimonio: tales son, entre otras muchas, los montes, rainas, arsenales, fortalezas y edificios militares.
Al declarar también del dominio público de la Nación las playas, se ha creído conveniente restablecer la disposición de nuestras antiguas leyes que de acuerdo con las romanas, les fijaban por límite aquel donde alcanzan las olas del mar en su temporales ordinarios, espacio bastante para las necesidades de la navegación y pesca; y en vez de la zona contigua de 20 varas, que después se ha considerado como ensanche de aquellas, se establecen sobre las heredades limítrofes las servidumbres de salvamento y vigilancia, con las cuales quedan suficientemente atendidos los intereses de la navegación en casos de naufragios, y los de la Hacienda pública para vigilancia de las costas, sin necesidad de condenar a perpetua esterilidad terrenos que en algunas comarcas son susceptibles, de cultivo. (Énfasis en el original suprimido y énfasis nuestro.) íd., pág. 620.
Según se desprende de la Exposición de Motivos de la Ley de Aguas de 1866, el propósito de la normativa española era sustraer los bienes de dominio público marítimo-terrestres del comercio de las personas, ya que dichos bienes sa *610 tisfacen necesidades colectivas y sustentan el bienestar común. Sin embargo, el propio esquema normativo permitía la apropiación de estos bienes bajo circunstancias que en aquel momento histórico lo justificaban. Explica Ma del Pino Rodríguez González en cuanto a esto:
Dentro del Derecho positivo español, fue la Ley de Aguas de 3 de agosto de 1866 la primera norma que reguló con carácter general las aguas marítimas y terrestres, y la que dio comienzo a la citada tendencia expansiva. En todo caso, incluyó dentro del dominio público marítimo-terrestre las costas o fronteras marítimas del territorio español con sus abras, ensenadas, calas, bahías y puertos; el mar litoral (hoy denominado mar territorial); las playas (sustituyendo este término al de ribera del mar utilizado primero por el Derecho romano y luego por Las Partidas), pero para referirse a la zona bañada por el flujo y reflujo del mar, definición que coincide en términos generales con el concepto de zona marítimo-terrestre acogido luego en las Leyes de Puertos de 1880 y 1928; así como, finalmente, los terrenos que se unen a las playas por accesiones o aterramientos ocasionados por el mar. No obstante, también esta norma; tras declarar el uso público de todos estos bienes, admitió la posibilidad de que los particulares fueran propietarios de las marismas y fincas colindantes con el mar o con sus playas o que adquirieran los terrenos ganados al mar mediante las obras de desecación de marismas propiedad del Estado o comunales. (Escolio omitido y énfasis nuestro.) J.V. González García y otros, Derechos de los Bienes Públicos, Valencia, Ed. Tirant Lo Blanch, 2005, pág. 135.
Un ejemplo de este esquema privatizador es el Art. 5 de la Ley de Aguas de 1866, supra, que dispone lo siguiente respecto a los terrenos ganados al mar:
Los terrenos ganados al mar por consecuencia de obras construidas por el Estado ó por las provincias, pueblos ó particulares competentemente autorizados, serán de propiedad de quien hubiere construido las obras, á no haberse establecido otra cosa en la autorización. (Énfasis nuestro.) Art. 5 de la Ley de Aguas de 1866, supra, pág. 295.
Se colige de este artículo que aunque el propósito de la ley era que los bienes de dominio público no estuvieran sujetos al tráfico comercial, el propio esquema legislativo *611 permitía que los terrenos sumergidos fueran privatizados a través de obras competentemente autorizadas que tuvieran como resultado ganar dichos terrenos al mar.
Posteriormente, España promulgó la Ley de Puertos de 1880, a la que hemos hecho referenda. Esta adoptó una clasificación de bienes de dominio público similar a la de la ley de 1866 y utilizó por primera vez el término jurídico zona marítimo terrestre. Los terrenos ganados al mar no fueron incluidos bajo esta clasificación de bienes. Al respecto, los Arts. 1 y 2 de la ley establecen lo siguiente:
Artículo 1° Son de dominio nacional y uso público, sin perjuicio de los. derechos que correspondan á los particulares:
Io La zona marítimo-terrestre, que es el espacio de las costas o fronteras marítimas del territorio español que baña el mar en su flujo y reflujo, en donde son sensibles las mareas, y las mayores olas en los temporales, en donde no lo sean.
Esta zona marítimo-terrestre se extiende también [sic] por las márgenes de los ríos hasta el sitio en que sean navegables ó se hagan sensibles las mareas.
2o El mar litoral, ó bien la zona marítima que ciñe las costas ó fronteras de los dominios de España, en toda la anchura determinada por el derecho internacional, con sus ensenadas, radas, bahías, puertos y demás abrigos utilizables para la pesca y navegación. En esta zona dispone y arregla el Estado la vigilancia y los aprovechamientos, así como el derecno de asilo e inmunidad^ conforme todo á las leyes y á los Tratados internacionales. (Enfasis nuestro.) Art. 1 de la Ley de Puertos española de 1880, supra, págs. 787-788.
Artículo 2° Son del dominio público los terrenos que se unen á la zona marítimo-terrestre por las accesiones y aterramientos que ocasione el mar. Cuando, por consecuencia de estas accesiones, y por efecto de retirarse el mar, la línea interior que limita la expresada zona avance hacia aquél, los terrenos sobrantes de lo que era antigua zona marítimo-terrestre pasarán á ser propiedad del Estado, previo el oportuno deslinde de los Ministerios de Hacienda, Fomento y Marina, y el primero podrá enajenarlos cuando no se consideren necesarios para servicios marítimos ú otros de utilidad pública. Si se enajenasen con arreglo á las leyes, se concederá el derecho de tanteo á los dueños de los terrenos colindantes. (Énfasis nuestro.) Art. 2 de la Ley de Puertos española de 1880, supra, pág. 788.
Esta ley de 1880 tuvo el propósito de desarrollar y ex- *612 plotar las zonas portuarias, por lo que no cambió significativamente el esquema privatizador que existía bajo la Ley de Aguas de 1866. Sobre esto, la tratadista Miralles González expresa lo siguiente:
La Ley de Puertos del 7 de mayo de 1880 vino a regular a modo supletorio la falta de legislación suficiente en la materia. Esta ley, como es abvio de su propia denominación, se centraba en la construction y explotación de las infraestructuras portuarias, por lo que sólo tangencialmente incidía en el tema que nos acupa. No obstante, la definición que dio en su artículo 1 de la “zona marítimo-terrestre” se convirtió en clásica y su referenda en obligado hito legislativo a partir del cual se incluían como pertenecientes al dominio público las riberas. (Énfasis nuestro.) Miralles González, op. cit., pág. 25.
La Ley de Puertos de 1880 no incluyó la norma establecida en el Art. 5 de la Ley de Aguas de 1866, según la cual los terrenos ganados al mar mediante obras realizadas con autorización competente eran propiedad de quien las hubiera realizado. Sin embargo, reguló los terrenos ganados al mar en los puertos de forma cónsona a dicho artículo, pues reconoció que algunos de estos terrenos pudieran ser propiedad del concesionario al disponer lo siguiente:
En las concesiones de obras en los puertos con las cuales se ganen terrenos al mar, se exceptuará siempre de los que se reconozcan de propiedad del concesionario la parte necesaria para la zona de servicio á que se refiere el artículo 31, la cual quedará de propiedad del Estado. (Énfasis nuestro.) Art. 57 de la Ley de Puertos de 1880, supra, pág. 799.
Con relación a los terrenos ganados al mar en zonas no portuarias, el 20 de agosto de 1883 España adoptó por Real Orden la Instrucción para tramitar las concesiones a particulares bajo la Ley de Puertos de 1880 (Instrucción de la Ley de Puertos de 1880), Colección Legislativa de España, Madrid, 1884, T. 131, 2da parte, pág. 390. Según la Instrucción, los terrenos ganados al mar fuera de zonas portuarias serían propiedad de quien hubiese realizado las obras con autorización competente, de forma compatible *613 con el esquema privatizador ya establecido bajo el Art. 5 de la Ley de Aguas de 1866.([26]) La doctrina española aplicó e interpretó la Ley de Puertos de 1880 de forma cónsona a la Instrucción. En cuanto a esto, Tomás Quintana López indica que
[l]a antigua Ley de Aguas de 1866 ya sancionó en su artículo 5 esta solución, posteriormente aceptada por la normativa reguladora de las aguas marítimas, reparando cada una de las normas siguientes en la circunstancia de que las obras para ganar terreno al mar se realicen fuera o dentro de los puertos.
Con posterioridad a la genérica privatización de los terrenos ganados al mar que contempla nuestra primera Ley de Aguas, es una norma de rango reglamentario —Real Orden de 20 de agosto de 1883— la que individualiza las obras realizadas fuera de los puertos para atribuir la propiedad de los terrenos ganados al mar mediante ellas a quien las hubiere realizado. La privatización de estos terrenos se mantiene en los Reglamentos de Puertos de 1912 y 1928, que, sin perturbar el principio, demanializan una zona de aquéllos para destinarla a la vigilancia del litoral. (Énfasis nuestro.) T. Quintana López, La privatización de los terrenos de que ha sido desalojado el mar, 111 R.A.P. 373, 384 (septiembre-diciembre 1986).
De igual manera, Martínez Escudero reitera lo siguiente:
La Ley de Aguas de 1866, en su artículo 5o, estableció que los terrenos ganados al mar por consecuencia de obras cons *614 truidas por el Estado o por las provincias, pueblos o particulares competentemente autorizados, serán de propiedad de quien hubiera construido las obras, a no haberse establecido otra cosa en la autorización.
En cambio, la Ley de Puertos de 1880 solamente se refiere —art. 57— a los terrenos ganados al mar dentro de los puertos, omitiendo la referencia a los terrenos ganados al mar fuera de los puertos, criterio seguido fielmente por la Ley de Puertos de 1928.
La laguna legal quedó salvada en los textos reglamentarios, en los que, en efecto, se halla regulada la cuestión de los terrenos ganados al mar tanto dentro como fuera de los puertos. Así: artículo 22 de la Instrucción de 20 de agosto de 1883, Artículo 99 del Reglamento de Puertos de 1912 y artículo 101 del Reglamento de 1928. (Escolios omitidos y énfasis nuestro.) Martínez Escudero, op. cit., pág. 147.
Según explicamos en la parte II de esta opinión, a través de la See. 8 de la Ley Foraker, supra, se mantuvieron en vigor las leyes y ordenanzas vigentes en Puerto Rico en 1900. Muñoz Díaz v. Corte, supra. Por esto, tanto el Código Civil español de 1889 como la Ley de Puertos española de 1880, extendida a Puerto Rico por Real Decreto en 1886 y denominada Ley de Puertos para la Isla de Puerto Rico (Ley de Puertos de 1886), mantuvieron su vigencia en la isla luego del traspaso de soberanía en 1898. Rubert Amstrong v. E.L.A., supra. Véase, además, Olivieri v. Biaggi, supra.
El Art. 2 del Real Decreto de la Ley de Puertos de 1886, supra, pág. 435, dispuso que el Ministro de Ultramar dictaría la instrucción para la ejecución de la ley. El 10 de mayo de 1886, cumpliendo con el mandato de este artículo, se adoptó por Real Orden la Instrucción del Ministro de Ultra-mar para implantar la Ley de Puertos de 1886 en Puerto Rico. Colección Legislativa de España, Madrid, 1887, T. 136, 2da parte, pág. 1116; Publicada en la Gaceta de Madrid el 19 de mayo de 1886, No. 139, 1886/03882. Veamos entonces cuál era la fuerza jurídica de la Instrucción de la Ley de Puertos de 1886, de acuerdo con el ordenamiento jurídico español vigente en aquel momento, con miras a determinar *615 si mantuvo su vigencia en Puerto Rico luego del traspaso de soberanía en 1898.
Según el Art. 50 de la Constitución Española de 1876, el Rey tenía la potestad de ejecutar las leyes. Además, según el Art. 54 de dicha Constitución, el Rey dictaba los decretos, los reglamentos y las instrucciones de aplicación general necesarios para la ejecución de las leyes. Los reglamentos y las instrucciones así dictados eran decretos u órdenes reales, dependiendo de la forma en que fueran adoptados para su publicación. M. Martínez Alcubilla, Diccionario de la Administración Española, Madrid, 1887, T. 8, págs. 277-278.
Tanto el Real Decreto como la Real Orden manifestaban y hacían efectiva la voluntad del Rey al implantar las leyes. La diferencia principal entre ambos instrumentos ejecutivos era su formalidad, ya que en el Real Decreto hablaba el Rey y en la Real Orden hablaba un Ministro a nombre del Rey sobre asuntos de menos importancia y solemnidad. F. Seix, Enciclopedia Jurídica Española, Barcelona, 1910, T. 26, págs. 580 y 586. Martínez Alcubilla, op. cit., pág. 277. Sobre la fuerza jurídica de un Real Decreto y una Real Orden, Francisco Seix explica que “a) el Real decreto no puede oponerse á la Constitución, ni derogar una ley; b) un Real decreto no debe ser derogado ni modificado por una Real orden ú otra disposición de inferior categoría formal”. (Enfasis suprimido.) Seix, op. cit., págs. 581-582.
En este caso, la Instrucción de la Ley de Puertos de 1886 fue dictada por el Ministro de Ultramar, quien tenía a su cargo el despacho de todos los asuntos de las provincias de Ultramar, y fue adoptada por el Rey mediante Real Orden. Véanse: Martínez Alcubilla, op. cit., T. 7, pág. 382; Seix, op. cit., pág. 563. ([27]) Por lo tanto, según el ordenamiento jurídico de España, la Instrucción de la Ley de Puertos de 1886 tenía fuerza administrativa y según la See. 8 de la Ley Foraker, *616 supra, mantuvo su vigencia en Puerto Rico luego del traspaso de soberanía en 1898, junto a las demás leyes y ordenanzas vigentes en aquel momento histórico.([28])
La Ley de Puertos de 1886 adaptó la clasificación de bienes de dominio público de la Ley de Puertos española de 1880 al contexto puertorriqueño. De esta forma, sus Arts. 1 y 2 disponen lo siguiente:
Artículo Io Son del dominio nacional y uso público, sin perjuicio de los derechos que correspondan á los particulares:
Io La zona marítima-terrestre, que es el espacio de las costas ó fronteras marítimas de la Isla de Puerto Rico y sus adyacentes que forman parte del territorio español, y que baña el mar en su flujo y reflujo, en donde son sensibles las mareas, y las mayores olas en los temporales en donde no lo sean.
Esta zona marítimo-terrestre se extiende también por las márgenes de los ríos hasta el sitio en que sean navegables ó se hagan sensibles las mareas.
2o El mar litoral ó bien la zona marítima que ciñe las costas de la Isla y sus adyacentes en toda la anchura determinada por el derecho internacional, con sus ensenadas, radas, bahías, puertos y demás abrigos utilizables para la pesca y navegación. En esta zona dispone y arregla el Estado la vigilancia y los aprovechamientos, así como el derecho de asilo e inmunidad, confiarme todo á las leyes y á los Tratados internacionales. (Enfasis nuestro.) Art. 1 de la Ley de Puertos de 1886, supra, pág. 436.
Artículo 2° Son de dominio público los terrenos que se unen á la zona marítimo-terrestre por las accesiones y aterramientos que ocasione el mar. Cuando por consecuencia de estas accesiones, y por efecto de retirarse el mar la línea interior que limita la expresada zona avance hacia aquél los terrenos sobrantes de lo que era antigua zona marítimo-terrestre, pasarán á ser propiedad del Estado, previo al oportuno deslinde por el Ministerio de Ultramar, de acuerdo con el de Marina; y el primero podrá enajenarlos cuando no se consideren necesarios para servicios marítimos ú otros de utilidad pública. Si se enajenasen con arreglo á las leyes, se concederá el derecho de tanteo á los dueños de los terrenos colindantes. (Enfasis nuestro.) Art. 2 de la Ley de Puertos de 1886, supra, pág. 436.
*617 La citada clasificación de bienes de dominio público no incluyó los terrenos ganados al mar artificialmente. Respecto a éstos, el Art. 22 de la Instrucción de la Ley de Puertos de 1886, Colección Legislativa de España, Madrid, 1887, T. 136, 2da parte, pág. 1124, dispone lo siguiente: “Los terrenos ganados al mar litoral fuera de los puertos, con obras construidas por el Estado, la provincia, los Municipios ó los particulares, competentemente autorizados, serán de propiedad de la entidad que los hubiere llevado a cabo.” (Enfasis nuestro.) A través de este artículo se extendió a Puerto Rico el esquema privatizador iniciado bajo la Ley de Aguas de 1866, que establecía que los terrenos ganados al mar con autorización competente en zonas no portuarias puertorriqueñas, serían propiedad de quien los hubiera creado. Esto, de forma cónsona al esquema jurídico español ya discutido que fue refrendado por la Ley de Puertos española de 1880 y su Instrucción. Por esto, la Instrucción de la Ley de Puertos de 1886 es crucial para la adjudicación de este caso.
En 1928 se adoptó la Ley de Muelles y Puertos de Puerto Rico (Ley de Puertos de 1928), Ley Núm. 59 de 30 de abril de 1928. Esta ley mantuvo la clasificación de bienes de dominio público establecida en los Arts. 1 y 2 de la Ley de Puertos de 1886, supra. Además, respecto a los terrenos ganados al mar, la See. 47 de la Ley de Puertos de 1928 dispuso que los capitanes de puertos y el Comisionado del Interior tenían la obligación de conservarlos. En lo pertinente, la See. 47 dispone:
Vigilar por sí y con su [sic] auxiliares, por la conservación de los muelles, malecones, terraplenes, y porque tanto éstos como los terrenos públicos que forman la zona marítima y los terrenos agregados a ella o ganados al mar, sean conservados y no sean ocupados sin el consentimiento del Comisionado del Interior. (Enfasis nuestro.) See. 47 de La Ley de Puertos de 1928, Leyes de Puerto Rico, pág. 463.
Este mandato de conservación aplicaba tanto a bienes públicos como a bienes patrimoniales. Por lo tanto, la See. *618 47 de la Ley de Puertos de 1928 citada no estableció una clasificación de bienes, sino que impuso la obligación de proteger, custodiar y mantener dichos bienes acorde a su clasificación.
La Ley de Puertos de 1928 también derogó “[t]oda ley o parte de ley que se oponga a la presente”. See. 52 de la Ley de Puertos de 1928, supra, pág. 465. Veamos entonces si el Art. 22 de la Instrucción de la Ley de Puertos de 1886, supra, que establece que los terrenos ganados al mar en zonas no portuarias son propiedad de quien los haya creado con autorización competente, se puede reconciliar con la citada See. 47 de la Ley de Puertos de 1928. Hacemos este ejercicio conscientes de nuestro deber de armonizar las disposiciones legales sobre una misma materia. Correa Suárez v. Junta Retiro para Maestros, 88 D.P.R. 590, 598 (1963); Garriga, Jr. v. Tribunal Superior, 88 D.P.R. 245, 248 (1963). En este sentido, salta a la vista que si bien ambas disposiciones tratan sobre los terrenos ganados al mar, el Art. 22 de la Instrucción de la Ley de Puertos de 1886 se refiere a la titularidad, y la See. 47 de la Ley de Puertos de 1928 se refiere a la conservación de dichos terrenos. De esta forma, el mandato de conservación de los terrenos ganados al mar que encontramos en la See. 47 de la Ley de Puertos de 1928 se puede reconciliar con el Art. 22 de la Instrucción de la Ley de Puertos de 1886, que establece que la titularidad de los terrenos ganados al mar en zonas no portuarias y con autorización competente será de quien los haya creado.
Además, la Ley de Puertos de 1928 no alteró la clasificación de bienes de dominio público que establece la Ley de Puertos de 1886. Según ya discutimos en la opinión, esta clasificación no incluye los terrenos ganados al mar. Por el contrario, la Ley de Puertos de 1968 incluyó expresamente los terrenos ganados al mar como bienes de dominio público y, por lo tanto, derogó el Art. 22 de la Instrucción de la Ley de Puertos de 1886.
*619 Examinemos ahora los cambios que se han hecho a nuestro Código Civil a través de los años, para determinar si éstos afectaron el esquema jurídico sobre los terrenos ganados al mar en zonas no portuarias vigente en Puerto Rico hasta 1968.
Según el Art. 338 del Código Civil español de 1889, supra, extendido a Puerto Rico por Real Decreto en dicho año, los bienes se clasificaban en dos categorías: dominio público o propiedad privada.([29]) En 1902, Puerto Rico enmendó su Código Civil, apartándose de la tradición española y adoptando la norma tripartita del estado de Louisiana, proveniente del Derecho romano, según la cual los bienes pueden ser comunes, de dominio público o privados. Art. 448 del Código Civil de Louisiana.([30]) Por esto, el Art. 254 del Código Civil de Puerto Rico de 1930 (31 L.P.R.A. see. 1023) establece que el mar y sus riberas son bienes comunes y no bienes de dominio público. Dicho artículo expresa lo siguiente: “Las cosas comunes son aquéllas cuya propiedad no pertenece a nadie en particular y en las cuales todos los hombres tienen libre uso, en conformidad con su propia naturaleza: tales son el aire, las aguas pluviales, el mar y sus riberas.”([31])
Ahora bien, de acuerdo con el Art. 12 del mismo cuerpo *620 de ley, el Código Civil se aplicará de manera supletoria en las materias que se rijan por leyes especiales. 31 L.P.R.A. sec. 12.([32]) Por lo tanto, mientras haya una ley especial de puertos que regule la titularidad de los terrenos en controversia en este caso, no habrá necesidad de recurrir a las disposiciones supletorias del Código Civil. Resolver lo contrario conllevaría concluir que una ley general puede derogar tácitamente las disposiciones de una ley especial, lo cual es contrario a derecho. Housing Investment Corp. v. Luna, 112 D.P.R. 173, 177-178 (1982); Sierra v. Tribl. Superior, 75 D.P.R. 841, 846-847 (1954); Vázquez v. Corte, 65 D.P.R. 598, 603 (1946).
Por lo tanto, el derecho aplicable a la controversia de titularidad sobre los terrenos ganados al mar en el “Condado Bay Parcel” al momento de llevarse a cabo las obras de relleno en la década de los cincuenta, es la clasificación de bienes de dominio público de la Ley de Puertos de 1886, supra, y el Art. 22 de la instrucción de dicha ley, supra.
Los terrenos sumergidos sobre los cuales se llevaron a cabo las obras de relleno que resultaron en el “Condado Bay Parcel”, eran bienes de dominio público bajo la Ley de Puertos de 1886. Según ya explicamos, el Art. 22 de la instrucción de dicha ley proveía para que dichos terrenos fueran privatizados a través de obras de relleno realizadas con la autorización competente. Por consiguiente, una vez el Gobierno de Puerto Rico llevó a cabo dichas obras con la autorización competente de las agendas facultadas para ello, los *621 terrenos ganados al mar se convirtieron en propiedad del gobierno, de acuerdo con la política pública vigente en aquel momento histórico. De esta forma, el “Condado Bay Parcel” se integró válidamente al comercio de las personas y no puede ser clasificada como bien de dominio público en la controversia de este caso.
Establecido lo anterior, debemos retomar la discusión respecto a los bienes de dominio público del “Coast Guard Parcel” y evaluar las consecuencias negativas históricas del esquema privatizador establecido por la Ley de Puertos de 1886 y su Instrucción, que han requerido un cambio significativo en la política pública de Puerto Rico encaminada a la protección efectiva de los bienes de dominio público marítimo terrestres.
XI. Potestad de la Rama Ejecutiva del Gobierno de Puerto Rico para destinar los bienes de dominio público del “Coast Guard Parcel” a uso patrimonial o privado
Los bienes de dominio público son bienes sustraídos de la actividad comercial porque satisfacen necesidades colectivas y sustentan el bienestar común. En función de la importancia pública de estos bienes, nuestro ordenamiento jurídico ha establecido, según ya explicamos en la parte IX de esta opinión, que los bienes de dominio público son inalienables, imprescriptibles e inembargables. Rubert Amstrong v. E.L.A., supra, pág. 620. Véanse, además: Figueroa v. Municipio de San Juan, 98 D.P.R. 534, 562-563 (1970); M.J. Godreau y J.A. Giusti, Las concesiones de la Corona y la propiedad de la tierra en Puerto Rico, siglos XVI-XX: un estudio jurídico, 62 (Núms. 3-4) Rev. Jur. U.P.R. 351, 562-564 (1993).
El tratadista Puig Peña explica que las cosas públicas o bienes de dominio público se caracterizan por lo siguiente:
Io Por ser inalienables, estar fuera de comercio y ser imprescriptibles.
*622 2o Por la imposibilidad de imponer sobre las mismas, cargas y servidumbres.
3o Por la generalización a todos los ciudadanos para obtener los beneficios y ventajas que lleva consigo el destino de utilidad pública.
4o Porque los agentes administrativos no tienen necesidad de dirigirse a los Tribunales de Justicia para proteger la cosa pública, pudiendo ejercitar su actividad coactiva para que la propiedad de la cosa pública sea respetada. F. Puig Peña, Tratado de Derecho Civil Español, Madrid, Ed. Rev. Der. Privado, 1958, T. I, Vol. II, págs. 299.
La afectación de un bien al dominio público puede darse por acto legislativo en protección del bienestar común. ([33]) Cuando esto ocurre, la ley puede identificar unos bienes en particular o puede establecer unas características o criterios a partir de los cuales se puede identificar un bien de dominio público. Por ejemplo, Martínez Escudero explica que todo bien al que pueda aplicársele la definición de zona marítimo-terrestre establecida por ley es un bien de dominio público. Martínez Escudero, op. cit., pág. 57. A su vez, Isabel Miralles González expone lo siguiente respecto a la afectación por acto legislativo:
La consideración de dominio público de un bien arranca de una declaración legal. El destino público de esos bienes se hace para todos aquellos que participen de la misma denominación, llámesele naturaleza o no, es decir, para todos aquellos bienes reconocibles por sus características intrínsecas, razón por la cual no precisan de un acto específico de afectación. Basta con que la Ley ... declare el carácter de bienes de dominio público a los de un tipo determinado, para que todos los que participan de esa misma naturaleza vengan a integrarse en dicho dominio. (Énfasis nuestro.) Miralles González, op. cit., pág. 69.
Por esto, si un bien es afectado como bien de dominio público mediante legislación y no ha perdido, por causas naturales, las características físicas o factores que lo hacen *623 formar parte de dicha clasificación jurídica, sólo un acto de igual fuerza jurídica podrá permitir su desafectación. ([34]) Constituye esto un ejercicio de política pública que llamaremos en adelante el principio de la desafectación. Al respecto, Godreau y Giusti explican lo siguiente:
En tanto la terminación o cesación de la utilidad pública per-mite que el bien sea enajenado, tal transformación no puede darse arbitrariamente o sólo mediante la determinación del funcionario o de la entidad que tenga su custodia; será necesario, o bien que la inutilidad surja de fenómenos naturales, o bien que me die un acto legislativo declarando el cese de tal utilidad pública. (Enfasis nuestro.) Godreau y Giusti, supra, pág. 563.
Además, Martínez Escudero nos explica lo siguiente respecto al principio de la desafectación:
Por lo que se refiere a las playas, la garantía de su inalienabilidad se encuentra en el hecho de que su destino al uso público está establecido por declaración expresa de la Ley ..., por lo cual sería preciso una disposición con fuerza de ley para hacer posible su enajenación. Martínez Escudero, op. cit., pág. 194.
De igual forma, Julio V. González García nos explica:
El fenómeno contrario al de la incorporación de un bien al dominio público está constituido por la desafectación de un bien, esto es, la operación por la cual el bien deja de estar destinado al cumplimiento de un uso general o un servicio público y perderán [sic] en el mismo instante la condición de bien de dominio público, pasando a estar integrado en el grupo de los bienes patrimoniales o, en ciertos casos recogidos en la legislación, yendo a manos privadas.
Para evitar los problemas que plantea la pérdida de destino de los bienes, resulta preciso un acto expreso en el que se tome esta decisión. Acto expreso que debe tener, como mínimo, el mismo rango que la decisión por la que entró un bien en el dominio público. González García y otros, op. cit., pág. 93.
*624 En la parte IX de esta opinión aclaramos que el esquema jurídico privatizador que existía en Puerto Rico antes de 1968 permitía la privatización de terrenos sumergidos a través de obras autorizadas que alteraban la naturaleza física de dichos terrenos, convirtiéndolos en terrenos ganados al mar, según la Instrucción de la Ley de Puertos de 1886. Según explicamos, dicha instrucción es un acto jurídico de fuerza administrativa bajo el esquema jurídico español. Por esto, el esquema privatizador extendido a Puerto Rico en 1886 era antagónico al principio de la desafectación, pues permitía que un acto administrativo regulara la desafectación de unos bienes de dominio público que fueron clasificados como tal por un acto legislativo. Ante esta realidad jurídica y sus consecuencias negativas, tanto la jurisdicción española como la nuestra han adoptado un nuevo esquema jurídico que evita dicho antagonismo, clasificando los terrenos ganados al mar como bienes de dominio público mediante acto legislativo. Veamos lo sucedido en España antes de examinar el esquema jurídico vigente actualmente en nuestra jurisdicción.
En España, donde el sistema privatizador de los bienes de dominio público marítimo-terrestre estuvo en vigor durante más de un siglo, la doctrina identificó las consecuencias negativas del sistema y reiteró la importancia de proteger dichos bienes. Ma del Pino Rodríguez González elabora sobre la importancia de los bienes de dominio público marítimo-terrestre en el contexto español, explicando lo siguiente:
Los bienes marítimo-terrestre juegan un papel protagonista dentro de la categoría general de los bienes de dominio público, A nadie se esconde la importancia que actualmente se asigna a aquéllos, lo cual justifica los objetivos proteccionistas que preside hoy su regulación legal y la actuación de nuestras Administraciones públicas. Y es que no debe olvidarse que estos bienes son susceptibles de un intenso aprovechamiento económico, no sólo porque es en la franja costera donde se concentra la mayor parte de la oferta turística española (actividad *625 que constituye una de las principal es fuentes de nuestra economía), sino también como objeto de explotación pesquera o como fuente de abundantes recursos mineros y petrolíferos. Se trata, por tanto, de terrenos valiosos por las grandes posibilidades que ofrecen, así como por su valor social como lugar de ocio y disfrute de los ciudadanos, pero escasos por las crecientes demandas que soportan y muy sensibles y de difícil recuperación en su equilibrio físico. (Enfasis nuestro.) González García y otros, op. cit., pág. 132.
La Exposición de Motivos de la Ley de Costas española de 1988 también se refiere a las consecuencias negativas del esquema jurídico privatizador bajo el régimen español de 1880 y la importancia de proteger los bienes de dominio público marítimo-terrestre en la actualidad:
Las consecuencias del creciente proceso de privatización y depredación, posibilitado por una grave dejación administrativa, han hecho irreconciliable, en numerosas zonas, el paisaje litoral de no hace más de treinta años, con un urbanismo nocivo de altas murallas de edificios al mismo borde de la playa o del mar, vías de transporte de gran intensidad de tráfico demasiado próximas a la orilla, y vertidos al mar sin depuración en la mayoría de los casos.
Este doble fenómeno de destrucción y privatización del litoral, que amenaza extenderse a toda su longitud, exige de modo apremiante una solución clara e inequívoca, acorde con la naturaleza de estos bienes, y que, con una perspectiva de futuro, tenga como objetivos la defensa de su equilibrio y su progreso físico, la protección y conservación de sus valores y virtualidades naturales y culturales, el aprovechamiento racional de sus recursos, la garantía de su uso y disfrute abierto a todos, con excepciones plenamente justificadas por el interés colectivo y estrictamente limitadas en el tiempo y en el espacio, y con la adopción de las adecuadas medidas de restauración. Ley Núm. 22/1988, Aranzadi, Repertorio Cronológico de Legislación, Vol. III, pág. 3474 (1988).
Por esto, en 1978 España elevó a rango constitucional los principios de inalienabilidad, imprescriptibilidad e inembargabilidad, así como el principio de la desafectación de los bienes de dominio público. De esta forma, el Art. 132.1 de la Constitución Española de 1978 dispone lo si *626 guíente: “La Ley regulará el régimen jurídico de los bienes de dominio público y de los comunales, inspirándose en los principios de inalienabilidad, imprescriptibilidad e inembargabilidad, así como su desafectación.” (Enfasis nuestro.) M. Pulido Quecedo, La Constitución Española: con la jurisprudencia del tribunal constitucional, Pamplona, Ed. Aranzadi, 1996, pág. 1592.
Además, el Art. 132.2 de la Constitución Española de 1978 delegó al legislador la clasificación o afectación de bienes de dominio público, y especificó que tanto la zona marítimo-terrestre como las playas, el mar litoral y los recursos naturales de la zona económica y la plataforma continental siempre serán de dominio público. Dicho artículo expresa lo siguiente: “Son bienes de dominio público estatal los que determine la ley y, en todo caso, la zona marítimo terrestre, las playas, el mar territorial y los recursos naturales de la zona económica y la plataforma continental.” Pulido Quecedo, op. cit. Según Ma del Pino Rodríguez González, esto significó para el ordenamiento jurídico español
... un paso decidido hacia la demanialidad absoluta de los espacios costeros. ([35]) Por vez primera en nuestra historia constitucional y sin que existan precedentes en el Derecho comparado, se hizo una declaración constitucional expresa e inequívoca a favor del carácter demanial de determinados bienes, con la particularidad de que los únicos a los que se atribuye directamente dicha clasificación pertenecen al dominio público marítimo-terrestre, mencionando, expresamente, a la zona marítimo-terrestre, playa, mar territorial y recursos naturales de la zona económica y plataforma continental, declarando definitivamente su titularidad pública a favor del Estado y remitiendo al legislador estatal el establecimiento de su régimen jurídico. (Enfasis nuestro.) González García y otros, op. cit., pág. 131.
España adoptó la Ley de Costas de 1988 basándose en este mandato constitucional y apartándose definitiva *627 mente del sistema privatizador de los bienes de dominio público que había existido en su jurisdicción desde 1866. Así lo reconoció la Exposición de Motivos de la ley al expresar lo siguiente:
La Ley cierra el paréntesis de signo privatizador que inició la Ley de Aguas de 1866 con un equívoco respecto a los derechos legítimamente adquiridos, que no deberían ser otros que los concesionales, continuado por las Leyes de Puertos de 1880 ..., así como por la Ley de Costas de 1969, a pesar de los graves problemas que ya existían en esta época y de la postura contraria y prácticamente unánime de la doctrina. (Citas omitidas.) Ley Núm. 22/1988, Aranzadi, Repertorio Cronológico de Legislacición, Vol. III, pág. 3475 (1988).
El Art. 4 de la Ley de Costas de 1988 clasificó los terrenos ganados al mar como bienes de dominio público. Ley núm. 22/1988, supra, pág. 3477. Esto, cumpliendo con el propósito de eliminar la posibilidad de que se pudiera adquirir la propiedad de los terrenos ganados al mar a través de obras y establecer, además, mecanismos que favorezcan la incorporación de terrenos al dominio público, con el objetivo de ampliar la estrecha franja costera que en 1988 contaba con la clasificación demanial en España. Id., pág. 3475.
Veamos ahora el esquema jurídico vigente en Puerto Rico en lo que respecta a los terrenos ganados al mar. En 1952 se aprobó la Constitución del Estado Libre Asociado de Puerto Rico. El Art. VI, Sec. 19, de la Constitución estableció como política pública del Estado Libre Asociado “la más eficaz conservación de sus recursos naturales, así como el mayor desarrollo y aprovechamiento de los mismos para el beneficio general de la comunidad”. Art. VI, Sec. 19, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1999, pág. 421. Este Tribunal ha interpretado que esta disposición constituye un mandato constitucional que impone al Estado el deber ineludible de conservar los recursos naturales, a la vez que procura su desarrollo y aprovechamiento para el beneficio general de la comunidad. Misión Ind. P.R. v. J.C.A., 145 D.P.R. 908, 919 (1998). Este mandato constitucional no es *628 más que la exigencia de lograr un desarrollo sostenible de los recursos naturales del país.
Un desarrollo sostenible es aquel que crea y mantiene las condiciones bajo las cuales el ser humano y la naturaleza pueden existir en armonía productiva. Véanse: Ley sobre Política Pública Ambiental, Ley Núm. 416 de 22 de septiembre de 2004 (12 L.P.R.A. see. 8001 et seq.); Ley sobre Política Pública de Desarrollo Sostenible, Ley Núm. 267 del 10 de septiembre de 2004 (23 L.P.R.A. sees. 501-508). Por lo tanto, la política pública de desarrollo sostenible nos impone el reto de lograr la conservación de los recursos naturales que es necesaria e imprescindible para sostener las necesidades de desarrollo del país, para bien tanto de las generaciones presentes como de las futuras. Esto, según expresamos hace más de una década, para establecer “una protección frente al Estado, la sociedad, el gobierno, e incluso el hombre, que en el mundo contemporáneo, sin darse cuenta que está socavando su propia existencia, destruye la naturaleza en aras de un materialismo y un consumismo rampante, creando desbalances sistémicos irreversibles”. Paoli Méndez v. Rodríguez, 138 D.P.R. 449, 462 (1995).
Este Tribunal ha reconocido que el mandato constitucional de lograr el desarrollo sostenible del país es el “criterio jurídico primordial para juzgar la validez o interpretar el significado de cualquier norma o decisión relativa al uso o protección de los recursos naturales formulada por la Asamblea Legislativa o por cualquier agencia, departamento, municipio o instrumentalidad gubernamental”. Misión Ind. P.R. v. J.C.A., 145 D.P.R. 908, 919-920 (1998). Además, he-mos determinado que esta disposición es un mandato que debe observarse rigurosamente y que prevalece sobre cualquier estatuto, reglamento u ordenanza que sea contraria a éste. Id.
Los bienes de dominio público marítimo-terrestres son recursos naturales que tienen una importancia tal en Puerto Rico que todo esquema jurídico que se haya adoptado *629 para su regulación deberá interpretarse según el mandato constitucional de lograr para éstos un desarrollo sostenible([36]) Nuestra Ley de Puertos de 1968 establece que los terrenos ganados al mar son bienes de dominio público, ya que los incluye específicamente dentro de la zona marítimoterrestre. ([37]) De esta forma, quedó derogada por acto legislativo la Instrucción de la Ley de Puertos de 1886, que permitía la privatización de estos terrenos a través de un acto administrativo([38]) Además, la Ley de Puertos de 1968 no adopta ni, por ende, permite la posibilidad de desafectar estos bienes.
*630 La Sec. 1.10(d) de la Ley de Puertos de 1968 (23 L.P.R.A. see. 2110) establece que a excepción de la zona marítimoterrestre incluida en una zona portuaria, para lo cual la ley provee específicamente, el Secretario de Transportación y Obras Públicas (antes Comisionado del Interior) tendrá sobre la zona marítimo-terrestre y los terrenos agregados a ellas o ganados al mar las mismas facultades y funciones de vigilancia, conservación y concesión de permisos que le fueron conferidas a través de las Secs. 18 y 47 de la Ley de Puertos de 1928. Ya vimos, en la parte IX de esta opinión, que la See. 47 de la ley de 1928 ordenaba la vigilancia y conservación de “los muelles, malecones, terraplenes, terrenos públicos que forman la zona marítima y los terrenos agregados a ella o ganados al mar”. See. 47 de la Ley de Puertos de 1928, supra.
En el contexto jurídico del Art. VI, Sec. 19, de nuestra Constitución de 1952, la jurisprudencia y la propia Ley de Puertos de 1968, el criterio jurídico primordial para interpretar el significado de la See. 47 de la Ley de Puertos de 1928 es el mandato constitucional de lograr el desarrollo sostenible de los bienes de dominio público marítimoterrestres, dado que la Ley de Puertos de 1968 clasificó los terrenos ganados al mar como bienes de dominio público marítimo- terrestres. Interpretada de esta forma, la See. 47 de la Ley de Puertos de 1928, supra, le impone al Secretario de Transportación y Obras Públicas la obligación de conservar los terrenos ganados al mar acorde a su clasificación demanial.
Por lo tanto, cuando los terrenos ganados al mar aledaños al “Coast Guard Parcel” entraron nuevamente a nuestra jurisdicción en 1991 eran terrenos ganados al mar afectados como bienes de dominio público y la Rama Ejecutiva del Gobierno de Puerto Rico no tenía discreción para desafectarlos y destinarlos a otro uso.
*631 XII. Los actos de la Rama Ejecutiva del Gobierno de Puerto Rico sobre los bienes de dominio público del “Coast Guard Parcel” luego de su adquisición en 1991
El 19 de diciembre de 1934, luego que Estados Unidos hubiera cedido al Pueblo de Puerto Rico la Reserva Naval San Gerónimo, el Comisionado del Interior del Gobierno de Puerto Rico emitió una certificación que identificó la reserva cedida como la finca 196 en el Registro de la Propiedad. El “Coast Guard Parcel” se inscribió a nombre de Estados Unidos en una nota marginal de la finca 196. El Acta Aclaratoria emitida por el Comisionado del Interior en 1935, antes de que Estados Unidos llevaran a cabo las obras de relleno en la parcela, describe el “Coast Guard Parcel” de la manera siguiente:
PARCELA B —Urbana— Parcela de terreno radicada en el barrio Puerta de Tierra, del término municipal de San Juan, cuya propiedad se reserva el Gobierno de los Estados Unidos de América. Tiene un [á]rea superficial de 1 hect[á]rea 87 áreas 93.24 centi[á]reas, equivalentes a 4 cuerdas con 781 centésimas de otra. Colinda al norte con la parcela A, antes descrita, propiedad de El Pueblo de Puerto Rico y arrendada al Teniente Comandante de Marina, retirado, Virgil Baker, por el sur con la margen norte de la variante de la Avenida Ponce de León que a ... al puente Guillermo Esteves; por el este con la zona marítima de la Laguna del Condado', y por el oeste, con terrenos propiedad del Gobierno de los Estados Unidos de América. Acta Aclaratoria del Comisionado del Interior de Puerto Rico de 17 de junio de 1935.
La descripción citada e inscrita en el Registro de la Propiedad no incluyó los terrenos sumergidos aledaños a la parcela. Después que la Administración de Terrenos de Puerto Rico adquiriera el “Coast Guard Parcel” del gobierno federal, se presentó la escritura de compraventa entre ambos gobiernos al Registro de la Propiedad en 1992. La descripción de la propiedad en la escritura incluyó los terrenos ganados al mar.
En 1991, el “Coast Guard Parcel” estaba zonifícada como una zona pública o recreativa (P). Sec. 2.02 del Reglamento *632 de Zonificación Especial del Condado, supra. Véase la parte IX de esta opinión. En 1993, la Junta de Planificación aprobó el Plan de Usos del Terreno y Reglamento de Zonificación Especial para la entrada de la Isleta de San Juan. Este plan adoptó la definición de la zona marítimo-terrestre, que incluye los terrenos ganados al mar como bienes de dominio público y rezonificó al “Coast Guard Parcel” como una Zona de Desarrollo Especial (ZDE-A). Véase Reglamento de Planificación Núm. 23, Reglamento Núm. 4918, Departamento de Estado, 15 de enero de 1993.
El 13 de diciembre de 1994 el Departamento de Recursos Naturales y Ambientales certificó el deslinde de la zona marítimo-terrestre de la “Coast Guard Parcel”, de acuerdo con un Plano de Mensura preparado por la Administración de Terrenos. El deslinde incluyó los terrenos ganados al mar como parte de la propiedad de dicha agenda.([39])
El 10 de septiembre de 1998 la Administración de Terrenos aprobó la venta del “Coast Guard Parcel” a la Corporación de Desarrollo Hotelero, subsidiaria de la Compañía de Turismo de Puerto Rico. El 15 de septiembre de 1998 el agrimensor Renán López de Azúa hizo una mensura del “Coast Guard Parcel” que corrige su descripción y cabida. Al describir la propiedad, dicho agrimensor especifica que ésta colinda con la Laguna del Condado, incluyendo, por lo tanto, los terrenos ganados al mar.
El 5 de octubre de 1998 la Administración de Terrenos y el Departamento de Transportación y Obras Públicas de Puerto Rico presentaron una Instancia Solicitando Rectificación, para abrir un folio independiente del “Coast Guard Parcel” que indicara que su titular era la Administración de Terrenos. Hasta entonces la parcela aparecía en una nota marginal a la finca 196. El Registrador de la Propiedad así lo hizo y designó al “Coast Guard Parcel” como la finca 904.
*633 El 21 de octubre de 1998 la Junta de Planificación aprobó la venta del “Coast Guard Parcel”. A renglón seguido, el 6 de noviembre de 1998 la Administración de Terrenos le transfirió la parcela a la Corporación de Desarrollo Hotelero a través de la Escritura Núm. 1 expedida por el notario público Juan Alberto Correa Suárez. Ese mismo día, la Corporación de Desarrollo Hotelero vendió la parcela a “Hilton Internacional of Puerto Rico, Inc.”, a través de la Escritura Núm. 1 autorizada por el notario público José Antonio Fernández Jaquete, la cual fue inscrita en el Registro de la Propiedad. Ambas escrituras, al igual que el deslinde de 1994, incluyen los terrenos ganados al mar como parte de la propiedad, ya que la describen como una parcela que colinda con la Laguna del Condado.
El 12 de enero de 2000 la Junta de Planificación acordó aprobar el proyecto mixto residencial, comercial y turístico propuesto por “San Gerónimo Caribe Project, Inc.” a través de una consulta de ubicación. Los terrenos objeto de la consulta fueron descritos en el párrafo 2 de la resolución administrativa de la manera siguiente:
El predio de consulta tiene una cabida de 6.51 cuerdas. El mismo está delimitado por el Norte, con el hotel Caribe Hilton, su estacionamiento y varias propiedades privadas; por el Sur, con la Avenida Ponce de León y la Laguna del Condado; por el Este, con la Laguna del Condado y el Fortín San Gerónimo [sic]; y por el Oeste con la Avenida Muñoz Rivera.
El 6 de junio de 2000 se actualizaron los estudios de título y el 21 de julio de ese año “Hilton Internacional of Puerto Rico, Inc.” vendió el “Coast Guard Parcel” a “San Gerónimo Caribe Project, Inc.”. Posteriormente, “San Gerónimo Caribe Project, Inc.” recibió los permisos administrativos para llevar a cabo el proyecto Paseo Caribe.([40]) En particular, la Administración de Reglamentos y Permisos *634 expidió los permisos de construcción y uso para los distintos componentes del proyecto, que incluyen la construcción de obras permanentes sobre los terrenos ganados al mar en la parcela.
Además, el 28 de octubre de 2002 el Subsecretario de Justicia emitió una opinión dirigida al Secretario del Departamento de Recursos Naturales y Ambientales, en la que se concluye que los terrenos ganados al mar en controversia no son bienes de dominio público. El Subsecretario explica que los terrenos ganados al mar aledaños al “Coast Guard Parcel” fueron desafectados prospectiva y permanentemente por los actos soberanos de Estados Unidos y, por lo tanto, a dichos terrenos no les aplica la Ley de Puertos de 1968, que clasifica los terrenos ganados al mar como bienes de dominio público marítimo-terrestre. Op. Sec. Just. Núm. 2002-19 de 28 de octubre de 2002. Como bien sabemos, no es hasta el 11 de diciembre de 2007 que el Secretario de Justicia reevaluó su posición y determinó que los terrenos ganados al mar en el “Coast Guard Parcel” son bienes de dominio público.
Estos hechos revelan que luego de que se adquiriera el “Coast Guard Parcel” en 1991, la Rama Ejecutiva del Gobierno de Puerto Rico administró los bienes de dominio público marítimo-terrestres en controversia como bienes patrimoniales. Estos actos denotan, a mi entender, una clara deficiencia en la administración pública de unos bienes que por mandato legislativo fueron afectados al dominio público para satisfacer necesidades colectivas y asegurar el bienestar común. Además, demuestran indiferencia respecto al valor histórico y cultural que tienen estos terrenos por estar localizados alrededor del Fortín San Jerónimo del Boquerón. Esto, sin ignorar el impacto negativo que dicha deficiencia e indiferencia causó al interés propietario del aquí peticionario, “San Gerónimo Caribe Project, Inc.”. Ante esta realidad, debemos evaluar el efecto de estos hechos sobre la titularidad de los terrenos en controversia.
*635 Uno de los actos contrarios a la naturaleza demanial de estos terrenos fue el deslinde que el Departamento de Recursos Naturales y Ambientales llevó a cabo en 1994. Dicho deslinde incluyó los terrenos ganados al mar en la propiedad de la Administración de Terrenos, incumpliendo así el mandato legislativo de la Ley de Puertos de 1968 que los sustrae del comercio de las personas.([41])
Un deslinde administrativo no adjudica titularidad ni otorga derechos de propiedad, sino que establece los límites entre los bienes de dominio público y las propiedades colindantes con éstos, creando una presunción de corrección sobre dicha delimitación. Al respecto Martínez Escudero indica que, de esa forma, “el deslinde permite fijar los límites de las playas y de la zona marítimo-terrestre, declarando respecto de ellas y a favor de la Administración un estado posesorio de hecho, sin prejuzgar las cuestiones relativas a la propiedad privada”. Martínez Escudero, op. cit, pág. 204. Véase, además, la Sec. 24.02 del Reglamento de Zonificación de la Zona Costanera y de Acceso a las Playas y Costas de Puerto Rico, Reglamento Núm. 17 de 31 de marzo de 1983.
Por lo tanto, el deslinde de 1994, aunque incluyó los terrenos ganados al mar, no concedió ningún derecho de propiedad sobre dichos bienes a la Administración de Terrenos. Sin embargo, el deslinde trajo como consecuencia que en 1998 el Registrador de la Propiedad creara un folio independiente del “Coast Guard Parcel” (Finca 904) en el *636 cual, conforme a la escritura de compraventa presentada en el registro en 1992 y el mencionado deslinde, se inscribieron los terrenos ganados al mar como parte del solar propiedad de la Administración de Terrenos. A esto siguió, según vimos, la venta de la parcela el 6 de noviembre del mismo año a la Corporación de Desarrollo Hotelero y, el mismo día, a “Hilton Internacional of Puerto Rico, Inc.”. Esta venta fue inscrita en el Registro de la Propiedad. Dos años más tarde, después que la Junta de Planificación aprobó el Proyecto Paseo Caribe, “Hilton Internacional of Puerto Rico, Inc.” vendió el “Coast Guard Parcel” a “San Gerónimo Caribe Project, Inc.”. Esta venta también fue inscrita en el Registro de la Propiedad e incluyó los terrenos ganados al mar como parte de la propiedad vendida. Por lo tanto, debemos determinar si dicha inscripción y su historial registral tuvo el efecto de conceder el título de propiedad de estos bienes de dominio público al peticionario. ([42])
El Tribunal de Primera Instancia concluyó que “San Gerónimo Caribe Project, Inc.” adquirió el título de propiedad sobre los terrenos ganados al mar en controversia por ser un tercero registral. No es correcta esta conclusión. La tercería registral es una protección que sólo puede oponerse respecto a bienes sujetos al comercio de las personas. Según hemos discutido, los bienes de dominio público son inalienables y están excluidos de dicho comercio. Figueroa v. Municipio de San Juan, supra, págs. 562 — 563; Rubert Armstrong v. E.LA., supra, pág. 620. Véase Godreau y Giusti, supra, págs. 562-564.
De acuerdo al principio de la inalienabilidad, el Art. 39 de la Ley Hipotecaria establece que los bienes de dominio pú *637 blico no son inscribibles en el Registro de la Propiedad. 30 L.P.R.A. see. 2202. Además, si la clasificación demanial de un bien surge de la ley, la fe pública registral no se puede oponer a la disposición legislativa. Al respecto, Rivera Rivera explica que “la norma jurídica no requiere de publicidad registral para que afecte a terceros”. L.R. Rivera Rivera, Derecho Registral Inmobiliario Puertorriqueño, 2da ed., San Juan, Jurídica Editores, 2002, pág. 159. De esta forma, cita a Lacruz Berdejo y expresa lo siguiente: “Las limitaciones y cargas públicas afectan a todos los propietarios por igual, vienen publicadas por ley, son cognoscibles por cualquiera y con ellas debe contar todo adquirente. Es el Derecho objetivo y no la situación individual jurídica del Registro quien informa sobre tales cargas.” Id.
Sin embargo, este caso presenta la situación particular de que la inscripción de los bienes demaniales fue producto de la venta de éstos por el Estado. Surge así la controversia de si la fe pública registral debe proteger a quien adquirió los bienes confiando en la inscripción causada por el Estado. Respecto a esta controversia Clavero Arevalo aclara lo siguiente:
La protección de la buena fe que hace este precepto, de quien adquiera un bien inscrito de persona que aparezca como titular registral del mismo, puede pugnar con la regla de la inalienabilidad del dominio público cuando el bien adquirido por el tercero tenga este carácter y lo adquiere de quienes a su vez lo adquirieron de la Administración pública. Si en tales casos la Administración puede hacer entrar en juego la inalienabilidad del dominio público para recobrar el bien vendido, el tercerp hipotecario puede también hacer entrar en juego el principio de la fe pública registral que le ampara .... ¿Cuál de estas dos protecciones debe prevalecer?
Para resolver esta interrogación hay que tener en cuenta que los bienes de dominio público están exceptuados del Registro de la Propiedad, La Ley hipotecaria tiene por objeto regular el comercio jurídico inmobiliario, y por ello quedan al margen de la misma los bienes que no son susceptibles de tráfico jurídico ....
Este carácter extrarregistral [sic] de los bienes de dominio público determina que para los mismos no puedan jugar los *638 principios hipotecarios, que sólo tienen validez para los bienes que tienen acceso al registro .... De esta manera, siendo el principio de la fe pública registral un principio hipotecario, no puede jugar en contra de la inálienabilidad del dominio público, porque estos bienes están exceptuados del Registro de la Propiedad.
El problema se plantea cuando los bienes de dominio público ... han tenido acceso al Registro y se han inmatriculado. Cree-mos que en tales casos procede la misma solución, por cuanto se tratará en todo caso de una inmatriculación y posteriores inscripciones indebidas, que no constituyen por sí mismas desafectado n del dominio público. (Enfasis nuestro.) M.F. Clavero Arevalo, La Inálienabilidad del Dominio Público, Sevilla, Instituto García Oviedo, Universidad de Sevilla, 1958, págs. 116-118. Véanse: Miralles González, op. cit., págs. 43-46; R. Fornesa Ribo, Eficacia del título hipotecario sobre parcelas de zona marítimo-terrestre, 46 R.A.P. 123, 140 — 144 (1965).

Acorde con lo anterior, aunque la administración pública erróneamente los haya inscrito y enajenado, estos bienes no perderán su naturaleza demanial a base de una inscripción inválida en el Registro de la Propiedad.

El que “San Gerónimo Caribe Project, Inc.” recibiera los permisos administrativos para llevar a cabo el proyecto Paseo Caribe, tampoco afecta el carácter demanial de los terrenos ganados al mar en controversia. Los permisos administrativos no confieren titularidad y mucho menos pueden convalidar un acto nulo de enajenación de bienes de dominio público. Por lo tanto, los permisos concedidos por las agendas administrativas a “San Gerónimo Caribe Project, Inc.” no afectan el carácter demanial de los terrenos ganados al mar en controversia.
XIII. Conclusión
El análisis histórico del Derecho y los principios jurídicos aplicables a las controversias sometidas a nuestra consideración demuestran, primeramente, que los terrenos ganados al mar en el “Condado Bay Parcel” sobre los que “San Gerónimo Caribe Project, Inc.” tiene el título de propiedad inscrito en el Registro de la Propiedad, no son *639 bienes de dominio público. Por eso concurro con la opinión mayoritaria en cuanto a esto. No puedo concurrir, sin embargo, con el análisis mayoritario respecto a los terrenos ganados al mar aledaños al “Coast Guard Parcel”. Los fundamentos discutidos me han convencido que éstos son bienes de dominio público y no son susceptibles de tráfico jurídico. Dada la realidad de que el peticionario adquirió y ha construido sobre esos terrenos como consecuencia, aparentemente, de errores del Estado, corresponde a la administración pública rectificar dichos errores haciendo un ejercicio competente de planificación, con el fin de lograr el desarrollo sostenible de estos bienes conforme a su regulación jurídica demanial y su realidad física actual.
La opinión mayoritaria de este Tribunal señala reiteradamente que el resultado de este caso afectará los derechos adquiridos de miles de familias y ciudadanos puertorriqueños que durante las décadas de los cuarenta y cincuenta establecieron sus propiedades sobre terrenos ganados al mar. Sin embargo, la opinión mayoritaria acepta, como lo hacemos en esta opinión, que los terrenos ganados al mar desde 1968 son bienes de dominio público en nuestra jurisdicción. Por lo tanto, al aplicar la Ley de Puertos de 1968 no se afectan los derechos adquiridos por dichos ciudadanos bajo el viejo régimen privatizador.

(1) El Art. II del Tratado de París dispone lo siguiente:
“España cede a los Estados Unidos la Isla de Puerto Rico y las demás que están bajo su soberanía en las Indias Occidentales, y la Isla de Guam en el Archipiélago de las Marianas o Ladrones.”Art. II, Tratado de París de 1898, L.P.R.A., Tbmo 1, ed. 1999, pág. 17.

(2) El Art. 339.1 del Código Civil español de 1889 dispone, en lo pertinente, lo siguiente:
“Son bienes de dominio público:
“1° Los destinados al uso público, como los caminos, canales, ríos, torrentes, puertos y puentes construidos por el Estado; las riberas, playas, radas y otros análogos.” (Enfasis nuestro.) Art. 339.1 del Código Civil español de 1889.

(3) El Art. 1 de la Ley de Puertos española de 1880 establece lo siguiente:
“Son del dominio nacional y uso público, sin perjuicio de los derechos de particulares:
“1° La zona marítimo-terrestre, que es el espacio de las costas o fronteras marítimas del territorio español que baña el mar en su flujo y reflujo, en donde son sensibles las mareas, y las mayores olas en los temporales, en donde no lo sean.
“Esta zona marítimo-terrestre se extiende tambi[é]n por las márgenes de los r[í]os hasta el sitio en que sean navegables [o] se hagan sensibles las mareas.” Art. 1 de la Ley de Puertos española de 1880, Colección Legislativa de España, Madrid, 1881, T. 124, 2da parte, pág. 787.

(4) En lo pertinente, la See. 8 de la Ley Foraker dispone lo siguiente:
“Que las leyes y ordenanzas de Puerto Rico actualmente en vigor, continuarán vigentes, excepto en los casos en que sean alteradas, enmendadas o modificadas por la presente; o hayan sido alteradas o modificadas por órdenes militares y decretos vigentes cuando esta ley entre a regir, y en todo aquello en que las mismas no resulten incompatibles, o en conflicto con las leyes estatutarias de los Estados Uni-dos no inaplicables localmente, o con las presentes disposiciones, hasta que sean alteradas, enmendadas o revocadas por la autoridad legislativa creada por la presente para Puerto Rico, o por una ley del Congreso de los Estados Unidos.” Carta Orgánica de 1900, 31 Stat. 79, Documentos Históricos, See. 8, L.P.R.A., Tomo 1, ed. 1999, págs. 8-9.

(5) La Ley Pública Núm. 249 de 1 de julio de 1902 dispone lo siguiente:
“Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the President be, and he is hereby, authorized to make, within one year after the approval of this Act, such reservation of public lands and buildings belonging to the United States in the island of Porto Rico, for military, naval, light-house, marine-hospital, post-offices, custom-houses, United States courts, and other public purposes, as he may deem necessary, and all the public lands and buildings, not including harbor areas and navigable streams and bodies of water and the submerged lands underlying the same, owned by the United States in said island and not so reserved be, and the same are hereby, granted to the government of Porto Rico, to be held or disposed of for the use and benefit of the people of said island: Provided, That said grant is upon the express condition that the government of Porto Rico, by proper authority, release to the United States any interest or claim it may have in or upon the lands or buildings reserved by the President under the provisions of this Act.” (Énfasis nuestro.) The Statutes at Large of the United States of America, Vol. XXXII, Parte I (die. 1901 — marzo 1903), págs. 731-732.

(6) Cabe señalar que el Secretario de Justicia de Estados Unidos expresa esta misma conclusión al emitir una opinión sobre otra Proclama del Presidente que creó una reserva naval en Puerto Rico el 26 de junio de 1903. En su opinión, el Secretario de Justicia federal expresó lo siguiente:
“These propositions are not tenable, for such lands as belonged to Spain, under the treaty of Paris, were ceded to the United States. The organic act of Porto Rico, section 13 (31 Stat. 80), especially reserved to the National Government “harbor areas and navigable waters.’ The act of July 1, 1902 (32 Stat., 731), under which the President issued his proclamation, especially provides that he may make such reservation of public buildings and lands in Porto Rico belonging to the United States ‘as he may deem necessary, and all the public lands and buildings, not including harbor areas and navigable streams and bodies of water and the submerged lands underlying the same, owned by the United States in said island and not so reserved be, and the same are hereby, granted to the government of Porto Rico.’ And the President in his proclamation reserving the tract in question, makes use of the same language.
“The southern boundary of the reservation, viewed from any aspect of the question, must be fixed at some line where the President has power and authority to establish it, and this under the organic act could not be upon ‘harbor areas and navigable waters,’ and under the act of July 1, 1902, and the proclamation based *581 thereon, it could not be upon ‘navigable streams of waters and the submerged lands underlying the same.’ In issuing his proclamation, the President could not have had in contemplation the submerged lands of the harbor, for he could not make these property of Porto Rico.” 25 U.S. Op. Atty. Gen. 172, 176 (1904). Véase, además, 22 U.S. Op. Atty. Gen. 544 (1899).

(7) A la misma conclusión llegó el Comisionado de lo Interior de Puerto Rico en la Certificación del 19 de diciembre de 1934, inscrita en el Registro de la Propiedad en el Folio 48vo, Tomo 9 de Puerta de Tierra, Finca 196. Dicha certificación describe la Reserva Militar de San Juan según la Proclama Presidencial de 1929.

(8) El ex Juez Presidente del Tribunal Supremo de Puerto Rico, Lie. José Trías Monge, expresó lo siguiente respecto a este artículo de la Ley Jones:
“En lo concerniente a la entrega a Puerto Rico del control de la superficie de los puertos y de los cursos y extensiones de agua navegables y los terrenos sumergidos bajo ellos que entonces perteneciesen a los Estados Unidos y que no hubiesen sido reservados para fines públicos, la ley Jones mejoraba la anterior ley orgánica, ya que el art. 13 de ésta expresamente excluía del control del gobierno de Puerto Rico estas zonas y aguas.” J. Trías Monge, Historia Constitucional de Puerto Rico, Río Piedras, EDUPR, 1981, Vol. II, pág. 91.
Según la Opinión del Secretario de Justicia de 7 de noviembre de 1930:
“Las superficies de puertos y terrenos sumergidos dentro y alrededor de la Isla de Puerto Rico están colocados bajo el dominio del Gobierno de Puerto Rico por la sección 8 de la Ley Orgánica, con sujeción a cualesquiera leyes de los Estados Unidos que sean aplicables. En el ejercicio de este dominio el Gobierno de Puerto Rico actúa por conducto de la Legislatura de Puerto Rico.
“Podrá usted notar del lenguaje usado en la sección 8 de la Ley Orgánica que las superficies de los puertos y los terrenos sumergidos no están colocados bajo el dominio de la Comisión de Servicio Público, sino bajo el Gobierno de Puerto Rico, lo que en realidad significa el poder legislativo de Puerto Rico.” Op. Sec. Just. Núm. 42 de 7 de noviembre de 1930, págs. 201 y 203.
Varias opiniones posteriores del Secretario de Justicia de Puerto Rico han abordado la discusión de los poderes que transfiere el Art. 8 de la Ley Jones al Gobierno de Puerto Rico. En particular, la Opinión del Secretario de Justicia de 8 de junio de 1951 expresa lo siguiente:
“Como se observará, el Artículo 8, supra, pone los terrenos sumergidos en y alrededor de la isla de Puerto Rico bajo el control del Gobierno de Puerto Rico, y los Artículos 7 y 8, conjuntamente, confieren a la Legislatura de Puerto Rico poderes legislativos amplios y discreción en relación con aguas en Puerto Rico.” Op. Sec. Just. Núm. 29 de 8 de junio de 1951, pág. 84.

(9) Véase, además, Op. Sec. Just. Núm. 2 de 10 de febrero de 1981.

(10) Véase el texto citado en el esc. 20.

(11) Véanse: Submerged Lands Act of 1953, 43 U.S.C.A. secs. 1301-1315; Territorial Submerged Lands Act, Ley Púb. Núm. 93-435 de 5 de octubre de 1974.

(12) Un ejemplo de una ley federal creada para la protección y conservación de las aguas navegables de Estados Unidos aplicable a Puerto Rico es el Clean Water Act, 33 U.S.C.A. see. 1251 et seq. Véase U.S. v. Rivera Torres, 826 F. 2d 151 (1er Cir. 1987).

(13) En particular, la See. 5 de la referida ley estableció lo siguiente:
“That as consideration for a suitable site and requisite rights, privileges, and easements for a receiving and distant-control radio station in Porto Rico the Secretary of the Navy be, and he hereby is, authorized to exchange or lease for such period as he may deem proper any land under naval control in Porto Rico not otherwise required for naval purposes: Provided, That in time of war or national emergency, if necessary, the Navy Department shall have without cost free and unlimited use of any land so exchanged or leased.” Sec. 5 de la Ley Púb. Núm. 35 de 12 de junio de 1921; The Statutes at Large of the United States of America, Vol. XLII, Parte I (abril 1921-marzo 1923), págs. 139-140.

(14) Específicamente, expresó lo siguiente:
“The people of Puerto Rico have filed a bill of intervention, alleging that the deed by the United States to Baker includes underwater area, and that the United States could not lease such area to Baker, because it belonged to the insular government, the people of Porto Rico, and that Baker defrauded the United States. The defendants answered, tendering a quitclaim deed by Commander Baker to the people of Porto Rico of all rights which the defendants had in such area, without prejudice to the interest of the United States.
“It will be seen that the government included the underwater area in their lease. The bill of complaint alleges that the tract, including the underwater area, belonged to the United States. We do not think it necessary to discuss the action of the people in the insular government with reference to this underwater area. So far as this suit is concerned, we think this question is settled by the tender by Commander Baker of a quitclaim deed to the insular government. This tendered deed was to 'release, relinquish, and quitclaim in favor of the people of Porto Rico any right, title, or interest which he has or may have by virtue of the said lease of July 15, 1921, to the submerged area.’ It seems clear to us that, if the insular government in fact owned this area, the lease by the United States to Baker was a nullity to this extent, and, if any bill of intervention were filed, it should have been directed primarily against the United States.” (Énfasis nuestro.) Baker v. United States, 27 F.2d 863, 877 (1er Cir. 1928).

(15) El Acta Aclaratoria del Comisionado del Interior de Puerto Rico de 17 de junio de 1935, que describe el “Coast Guard Parcel”, tampoco incluye estos terrenos al expresar que la reserva colinda con la zona marítimo terrestre adyacente a ésta. En lo pertinente, el Acta Aclaratoria expresa lo siguiente:
“PARCELA B —Urbana— Parcela de terreno radicada en el barrio Puerta de Tierra, del término municipal de San Juan, cuya propiedad se reserva el Gobierno de los Estados Unidos de América. Tiene un [á]rea superficial de 1 heet[á]rea 87 área[s] 93.24 centi[á]reas, equivalentes a 4 cuerdas con 781 centésimas de otra. Colinda al norte con la parcela A, antes descrita, propiedad de El Pueblo de Puerto Rico y arrendada al Teniente Comandante de Marina, retirado, Virgil Baker, por el sur con la margen norte de la variante de la Avenida Ponce de León que a ... al puente Guillermo Esteves; por el este con la zona marítima de la Laguna del Condado; y por el oeste, con terrenos propiedad del Gobierno de los Estados Unidos de América.”

(16) En particular, la Ley Púb. Núm. 703 dispone lo siguiente:
“[I]n order to expedite the building up of the national defense, the Secretary of War is authorized, out of the moneys appropriated for the War Department for national-defense purpose for the fiscal year ending June 30, 1941, with or without advertising, (1) to provide for the necessary construction, rehabilitation, conversion, and installation at military posts, depots, stations, or other localities, of plants, buildings, facilities, utilities and appurtenances thereto (including Government-owned facilities at privately owned plants and the expansion of such plants, and the acquisition of such land, and the purchase or lease of such structures, as may be necessary).” Ley Pública Núm. 703 de 2 de julio de 1940, Statutes at Large of the United States of America, Vol. 54, Parte I (1931-1941), pág. 714.

(17) Incluso, el teniente coronel J. Hyde, del Cuerpo de Ingenieros de Estados Unidos, reconoce que los terrenos sumergidos eran propiedad del Pueblo de Puerto Rico en su memorando de 27 de enero de 1941. En particular, expresa:
*594 “The Acting Commissioner of the Interior states in the attached Letter that the land belongs to the People of Puerto Rico, and recommends that steps be taken to transfer this land to the Navy Department.
“The land where the proposed construction is to be made is owned by the People of Puerto Rico.” (Enfasis nuestro.)

(18) La comunicación del Comisionado Interino del Departamento del Interior de Puerto Rico expresa que la Ley Núm. 66 de 25 de abril de 1940 (Ley Núm. 66), 1940 Leyes de Puerto Rico 477-479, aplica a los terrenos sumergidos aledaños al “Coast Guard Parcel”. Esta ley autoriza que el gobernador de Puerto Rico transfiera los terrenos sumergidos al gobierno federal para propósitos de defensa nacional. Sin embargo, la propia Ley Núm. 66 expone que sus disposiciones aplican a los terrenos sumergidos que se encuentran alrededor de la Bahía de San Juan. La Laguna del Condado no forma parte de la Bahía de San Juan, aunque sus aguas estén conectadas por el Canal San Antonio y, por ende, la Ley Núm. 66 no aplicaba a los terrenos en controversia.

(19) De forma cónsona, establecimos en Roberts v. U.S.O. Council of P.R., 145 D.P.R. 58 (1998), que, como norma general, en los enclaves militares de Estados Unidos hay jurisdicción legislativa federal exclusiva. Al respecto, definimos que la jurisdicción legislativa se refiere a “quién tiene la facultad de regular, mediante legislación, determinada materia, hecho o situación”.

(20) La Ley de Relaciones Federales, 48 U.S.C.A see. 749, expresa lo siguiente:
“The harbor areas and navigable streams and bodies of water and submerged lands underlying the same in and around the island of Porto Rico [Puerto Rico] and the adjacent islands and waters, now owned by the United States on March 2, 1917, and not reserved by the United States for public purposes, are placed under the control of the government of Puerto Rico, to be administered in the same manner and subject to the same limitations as the property enumerated in the preceding sections *596 747 and 748 of this title. All laws of the United States for the protection and improvement of the navigable waters of the United States and the preservation of the interests of navigation and commerce, except so far as the same may be locally inapplicable, shall apply to said island and waters and to its adjacent islands and waters. Nothing in this chapter contained shall be construed so as to affect or impair in any manner the terms or conditions of any authorizations, permits, or other powers heretofore lawfully granted or exercised in or in respect of said waters and submerged lands in and surrounding said island and its adjacent islands by the Secretary of War [Secretary of the Army] or other authorized officer or agent of the United States prior to March 2, 1917. Notwithstanding any other provision of law, as used in this section (1) “submerged lands underlying navigable bodies of water” include lands permanently or periodically covered by tidal waters up to but not above the line of mean high tide, all lands underlying the navigable bodies of water in and around the island of Puerto Rico and the adjacent islands, and all artificially made, filled, in, or reclaimed lands which formerly were lands beneath navigable bodies of water; (2) “navigable bodies of water and submerged lands underlying the same in and around the island of Puerto Rico and the adjacent islands and waters” extend from the coastline of the island of Puerto Rico and the adjacent islands as heretofore or hereafter modified by accretion, erosion, or reliction, seaward to a distance of three marine leagues-, (3) “control” includes all right, title, and interest in and to and jurisdiction and authority over the submerged lands underlying the harbor areas and navigable streams and bodies of water in and around the island of Puerto Rico and the adjacent islands and waters, and the natural resources underlying such submerged lands and waters, and includes proprietary rights of ownership, and the rights of management, administration, leasing, use, and development of such natural resources and submerged lands beneath such waters.” (Énfasis nuestro.) 48 U.S.C.A. sec. 749.

(21) Respecto a la aplicación del derecho común federal (“federal common law”), el tratadista Chemerinsky nos explica lo siguiente:
“The phrase federal common law refers to the development of legally binding federal law by the federal courts in the absence of directly controlling constitutional or statutory provisions.” (Énfasis en el original omitido y énfasis nuestro.) E. Chemerinsky, Federal Jurisdiction, Boston, Ed. Little, Brown and Company, 1989, pág. 293.
En particular, respecto a la aplicación del derecho común federal cuando existe un interés propietario de Estados Unidos, Chemerinsky explica:
“[FJederal common law has developed where the Supreme Court has decided that federal rules are ‘necessary to protect uniquely federal interests.’ Included in this category is the creation of federal common law to protect federal proprietary interests in cases involving the United States government ....” (Escolio omitido.) *597 Chemerinsky, op. cih, pág. 297. Véase, además, J.P. Ludington, The Supreme Court and the Post-Erie Federal Common Law, 31 L.Ed.2d 1006.

(22) En lo pertinente, la See. 7 de la Ley de Relaciones Federales, supra, dispone lo siguiente:
“Disponiéndose, que el Presidente podrá de tiempo en tiempo, a su discreción, traspasar al Pueblo de Puerto Rico aquellos terrenos, edificios o intereses en terrenos u otras propiedades pertenecientes en la actualidad a los Estados Unidos y dentro de los límites territoriales de Puerto Rico, que a su juicio no se necesiten ya para propósitos de los Estados Unidos.” L.P.R.A., Tomo 1, ed. 1999, pág. 218.

(23) En California State Lands Comm’n v. United States, 457 U.S. 273 (1982), el Tribunal Supremo federal estableció una distinción entre ese caso y el caso State Land Board v. Corvallis Sand & Gravel Co., 429 U.S. 363 (1977), basándose en que en Corvallis, la controversia giraba en torno a un terreno que colindaba con el lecho de un río que el gobierno federal había patentizado, mientras que en California State Lands, se trataba de una parcela costera que aún era propiedad del gobierno federal. Además, el Tribunal Supremo federal distinguió la norma de Corvallis de aquellas controversias que se refieran a una propiedad costera patentizada por el gobierno federal. Esto, según explica el Juez Rehnquist en su opinión concurrente en California State Lands, supra, pág. 290 (a la que se unieron los Jueces Stevens y O’Connor), se hizo a modo de dicta, pues el terreno en controversia era propiedad de la Guardia Costera de Estados Unidos, lo cual hacía innecesario referirse a terrenos patentizados por el gobierno federal. Por lo tanto, dicha distinción no era pertinente al caso.

(24) En vista de lo anterior, no es correcto aseverar que la aplicación de la Ley de Puertos de 1968 es retroactiva.

(25) Los Arts. 1 y 4 de la Ley de Aguas de 1866 disponen lo siguiente:
“Artículo 1° Son de dominio nacional y uso público
“1° Las costas o fronteras marítimas del territorio español, con sus obras, ensenadas, calas, radas, bahías y puertos.
“2° El mar litoral, ó bien la zona marítima que ciñe las costas, en toda la anchura determinada por el derecho internacional. En esta zona dispone y arregla el Estado la vigilancia y los aprovechamientos, así como el derecho de asilo e inmunidad, conforme á las leyes y á los tratados internacionales.
“3° Las playas. Se entiende por playa el espacio que alternativamente cubren y descubren las aguas en el movimiento de la marea. Forma su límite interior ó terrestre la línea hasta donde llegan las más altas mareas y equinocciales. Donde no fueren sensibles las mareas, empieza la playa por la parte de tierra en la línea a donde llegan las aguas en las tormentas ó temporales ordinarios.” (Enfasis nuestro.) Art. 1 de la Ley de Aguas de 1866, Colección Legislativa de España, Madrid, 1866, T. 9, 2da parte, págs. 294-295.
*609 “Artículo 4° Son del dominio público los terrenos que se unen á las playas por las accesiones y aterramientos que ocasione el mar. Cuando ya no los bañen las aguas del mar, ni sean necesarios para los objetos de utilidad pública, ni para el establecimiento de especiales industrias, ni para el servicio de vigilancia, el Gobierno los declarará propiedad de los dueños de las fincas colindantes en aumento de ellas.” (Enfasis nuestro.) Art. 4 de la Ley de Aguas de 1866, supra, pág. 295.

(26) El Art. 22 de la instrucción estableció lo siguiente respecto a los terrenos ganados al mar en y fuera de los puertos:
“Los terrenos ganados al mar litoral fuera de los puertos con obras construidas por el Estado, las provincias, los Municipios ó los particulares, competentemente autorizados, serán de propiedad de la entidad que los hubiere llevado á cabo.
“En las concesiones de obras dentro de los puertos, en las cuales se ganan terrenos al mar, sólo se reconocerá de propiedad de los concesionarios la parte que no ocupe la zona de servicio, á que se refiere el art. 31 de la ley, y fuera de ella no resulte destinada á vías y servicios públicos en el estudio de los terrenos sobrantes, así de los ya existente como de los ganados al mar, para distribuirlos en relación al ensanche de las poblaciones y á su enlace con los puertos; estudio que ha de aprobarse antes del otorgamiento de la concesión, oyendo á los respectivos Ayuntamientos, y que ha de acompañar á todo proyecto de puerto.” Art. 22 de la Instrucción de la Ley de Puertos española de 1880, Colección Legislativa de España, Madrid, 1887, T. 136, 2da parte, pág. 1124.

(27) El Ministerio de Ultramar fue creado por Real Decreto de 20 de mayo de 1863 para atender todos los asuntos de las provincias de ultramar. M. Martínez Alcubilla, Diccionario de la Administración Española, Madrid, 1887, T. 7, pág. 382. Véase F. Seix, Enciclopedia Jurídica Española, Barcelona, 19Í0, T. 22, pág. 563.

(28) Ejemplo de otra ley y otro reglamento que mantuvieron su vigencia luego del cambio de soberanía en 1898 son la ley hipotecaria y su reglamento. Giménez et al. v. Brenes, 10 D.P.R. 128, 138 (1906).

(29) El Art. 338 del Código Civil español dispone lo siguiente: “Los bienes son de dominio público o de propiedad privada.”

(30) En lo pertinente, el Art. 448 del Código Civil de Louisiana dispone lo siguiente: “Things are divided into common, public, and private.” Yiannopoulos explica que esta división se deriva del “Romanist tradition and corresponds with divisions of things in the civil codes of other jurisdictions”. 2 A.N. Yiannopoulos, La. Civ. L. Treatise, Property Sec. 45, pág. 83 (2001).

(31) Aunque Puerto Rico adoptó la norma tripartita del estado de Lousiana, dicho estado no clasifica la zona marítimo-terrestre ni el mar litoral de sus costas como cosas comunes. Por el contrario, las clasifica como cosas públicas. Sobre esto, los Arts. 449 y 450 del Código Civil de Louisiana disponen lo siguiente:
“Common things may not be owned by anyone. They are such as the air and the high seas that may be freely used by everyone comformably with the use for which nature has intended them.” (Énfasis nuestro.) Art. 449 del Código Civil de Lousiana.
“Public things are owned by the state or its political subdivisions in their capacity as public persons.
“Public things that belong to the state are such as running waters, the water and bottoms of natural navigable bodies, the territorial sea, and the seashore.
*620 “Public things that may belong to political subdivisions of the state are such as streets and public squares.” (Énfasis nuestro.) Art. 450 del Código Civil de Louisiana.
Respecto al Art. 450, Yiannopoulos explica lo siguiente:
“Article 450 of the Louisiana Civil Code places the ‘sea’, that is, the water and bottom of the Gulf of Mexico within Lousiana borders, in the category of public things. This deviation from the Romanist tradition, according to which the sea is a common thing, was prompted by well-established Louisiana practice antedating the 1978 revision.” (Escolios omitidos.) A.N. Yiannopoulos, supra, Sec. 69, págs. 130-131. Véase Figueroa v. Municipio de San Juan, 98 D.P.R. 534, 566 (1970), para una discusión sobre la adopción de las normas del Código Civil de Louisiana en nuestra jurisdicción.

(32) «j¡¡n ias materias que se rijan por leyes especiales, la deficiencia de éstas se suplirá por las disposiciones de este título.” 31 L.P.R.A. sec. 12.

(33) véase J.V. González García y otros, Derechos de los Bienes Públicos, Valencia, Ed. Tirant Lo Blanch, 2005, págs. 88-92, para una discusión sobre las posibles formas de afectación de un bien al dominio público.

(34) Adviértase que no hemos abordado el análisis jurídico de qué ocurre cuando la pérdida de las características físicas de un bien de dominio público sean causadas por la voluntad o arbitrariedad del ser humano y no por procesos naturales.

(35) El concepto “demanial” significa perteneciente o relativo al demanio o dominio público. Diccionario de la Real Academia Española, http://buscon.rae.es/draeI/, (última visita el 2 de julio de 2008).

(36) En cuanto a la urgencia de proteger estos bienes en el contexto puertorriqueño, resultan particularmente reveladoras las siguientes expresiones del Reglamento para el Aprovechamiento, Vigilancia, Conservación y Administración de las Aguas Territoriales, los Terrenos Sumergidos bajo Éstas y la Zona Marítimo Terrestre, Reg. Núm. 4860 de 29 de diciembre de 1992, págs. 2 y 5-6:
“Puerto Rico es una isla cuya extensión territorial es relativamente limitada. Con una cordillera montañosa central y reducidos llanos costeros, aproximadamente la mitad del área superficial consiste de montañas y colinas con declives de 45 grados o más. Los relativamente planos terrenos costeros constituyen una tercera parte del espacio superficial y un 80 porciento del total de superficie plana. Como es de esperarse, gran parte del desarrollo de la Isla ha ocurrido, precisamente, en los llanos costeros y sus inmediaciones.
“Hoy, casi quince años después de la aprobación del Programa de Manejo, y de la suscripción de acuerdos por entidades del ELA y del gobierno federal, las aguas territoriales, los terrenos sumergidos y la zona marítimo-terrestre continúan caracterizándose por la proliferación de usos antagónicos y conflictivos. El aprovechamiento privado de bienes del dominio público, reflejado por la privatización de facto de la zona marítimo-terrestre mediante construcciones que reducen parcial o totalmente los accesos a las playas; el menoscabo de la integridad de los sistemas naturales típicos de la costa, reflejado por el vertido, con y sin autorización, de aguas residuales o por el acceso a éstos de personas en exceso de su capacidad de acarreo; el incremento en los riesgos a la seguridad pública y propiedad, resultantes de construcciones y desarrollos dentro de la zona^marítimo-terrestre que ocasionan la erosión y degradación del litoral, continúan.” (Énfasis nuestro.)

(37) El Art. 1, Sec. 1.03 de la Ley de Puertos de 1968 (23 L.P.R.A. see. 2103), define este término de la manera siguiente:
“[E]l espacio de las costas de Puerto Rico que baña el mar en su flujo y reflujo, en donde son sensibles las mareas, y las mayores olas en los temporales en donde las mareas no son sensibles, e incluye los terrenos ganados al mar y las márgenes de los ríos hasta el sitio en que sean navegables o se hagan sensibles las mareas; y el término, sin condicionar, significa la zona marítimo terrestre de Puerto Rico.” (Énfasis nuestro.)

(38) Adviértase que esta ley no tiene efecto retroactivo, por lo que no cabe argumentar que aplica a la controversia de los terrenos que constituyen el “Condado Bay Parcel”. Véase el Art. 1, Sec. 1.11 de la Ley de Puertos de 1968 (23 L.P.R.A. see. 2111).

(39) El deslinde de la zona marítimo-terrestre hecho por el Departamento de Recursos Naturales y Ambientales en 1998 fue respecto a los terrenos del Hotel Caribe Hilton, y no respecto al “Coast Guard Parcel”.

(40) Véase el índice o resumen de los permisos otorgados a Paseo Caribe que surge del expediente.

(41) En 1992 el Departamento de Recursos Naturales y Ambientales adoptó el Reglamento para el Aprovechamiento, Vigilancia, Conservación y Administración de las Aguas Territoriales, los Terrenos Sumergidos bajo Éstas y la Zona Marítimo Terrestre, supra, para atemperar la legislación reguladora de los bienes de dominio público marítimo terrestres a las realidades contemporáneas de conservación y crear criterios y mecanismos para la delimitación, vigilancia, conservación, saneamiento y otorgación de concesiones y autorizaciones para el uso y aprovechamiento de dichos bienes. En su Art. 2.108 el reglamento adopta la definición de la zona marítimoterrestre de la Ley de Puertos de 1968, supra, que incluye los terrenos ganados al mar. El Art. 3 del reglamento establece el proceso de deslinde que lleva a cabo el Departamento de Recursos Naturales y Ambientales para determinar el límite tierra adentro de la zona marítimo-terrestre según definida en el Art. 2.108.

(42) Debemos aclarar que el caso Rubert Armstrong v. E.L.A., 97 D.P.R. 588 (1969), no aplica a esta controversia registral. En dicho caso se determinó que la parcela en controversia no era un bien de dominio público, de acuerdo con la Ley de Puertos de 1880, ya que dicha ley no tenía efecto retroactivo sobre derechos adquiridos e inscritos en el Registro de la Propiedad y, además, permitía la privatización de marismas. Id., págs. 624-631.